# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 2 9 2013

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Aug 29, 2013

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| FRIENDS OF THE COLUMBIA GORGE, INC., and SAVE OUR SCENIC AREA, | ) ) ) | No. 88089-1 |
| Petitioners, | ) ) ) | |
| v. | ) ) | En Banc |
| STATE ENERGY FACILITY SITE EVALUATION COUNCIL and CHRISTINE O. GREGOIRE, governor of the STATE OF WASHINGTON, | ) ) ) ) ) | |
| Respondents, | ) ) | |
| and | ) ) | |
| WHISTLING RIDGE ENERGY LLC, SKAMANIA COUNTY, and KLICKITAT COUNTY PUBLIC ECONOMIC DEVELOPMENT AUTHORITY, | ) ) ) ) ) | |
| Intervenors-Respondents. | ) ) | Filed AUG 2 9 2013 |

C. JOHNSON, J.—This case concerns the siting of a wind powered energy facility under the energy facilities site locations act (EFSLA), chapter 80.50 RCW. This statutory scheme creates an administrative body not only to evaluate applications for the construction and operation of energy facilities in the state, but also to conduct hearings and adjudications before ultimately making a

recommendation to the governor. Here, the administrative body, after reducing the scope of the project applied for, recommended that Governor Gregoire approve the project, which she did. Opponents of the project then sought judicial review under the Administrative Procedure Act (APA), chapter 34.05 RCW. The superior court certified the issue directly to this court as allowed under EFSLA.

The challenge here focuses on the site certification agreement and whether it, and the process leading up to it, complied with the statutory and regulatory requirements. In *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 197 P.3d 1153 (2008) (*Residents*), we resolved many of the foundational jurisdictional, procedural, reviewability, and substantive issues relevant to the statutory interplay and applicability. Some of the issues in this case touch upon the analysis and conclusions resolved by that opinion. For the reasons that follow, we find no basis to reverse the Energy Facility Site Evaluation Council's (EFSEC) recommendation or the governor's approval of the project.

## I.     FACTS AND PROCEDURAL HISTORY

### a. GENERAL OVERVIEW

Whistling Ridge Energy Project (WREP) submitted an application to EFSEC to build and operate a wind powered energy facility in southeastern Washington.

EFSEC conducted the required hearings and adjudications[1] before making a recommendation, which the governor followed, to approve a modified version of the project. The governor executed a site certification agreement (SCA) that acts essentially as a contract between the State and applicant, specifying the conditions and requirements of approval. Administrative Record (AR) at 29266-330. Petitioners now challenge the process and substance of that approval.

There are several parties to the current appeal. Two environmental groups, Friends of the Columbia Gorge and Save Our Scenic Area (collectively Friends), are the petitioners and seek invalidation of the SCA and remand to EFSEC for further study and evaluation of the project. The other parties write in support of the project. EFSEC and the governor defend approval of the project in a joint brief, as do Skamania County and the Klickitat County Public Economic Development Authority. WREP also filed a brief arguing that this court should affirm EFSEC's recommendation and the governor's execution of the SCA.

The project site is located in a rural portion of southeast Washington. The initial application was for 50 wind turbines, though the ultimate recommendation and agreement provide for 35, partially in response to concerns regarding views from the Columbia River Gorge National Scenic Area. The project would sit on

---

[1] Petitioners make no argument that EFSEC failed to conduct any required hearing, adjudication, or public meeting. Instead, our review is of the record made by EFSEC.

roughly 1,152 acres, though only about 57 acres would be permanently developed. The land is owned by a parent company of WREP and has been logged for most of the last century. There are few large conifers, no late-successional stands, and no old forest habitats. The land contains a network of logging roads, two clear-cut corridors for Bonneville Power Administration high voltage lines, as well as a natural gas pipeline on the north end of the site. No wind turbine would be within 4,000 feet of a residence.

The project site is also within sight of a national scenic area that is protected by both federal law and a compact between Washington and Oregon. No issues in the present appeal relate directly to the national scenic area or compact. Further, the Columbia River Gorge is recognized by many for its pristine natural environment and beauty. The project site also appears to lie within the habitat of many species of wildlife. It is part of a northern spotted owl special emphasis area[2] and is either home or a migratory route for 90 species of birds and 15 species of bats.

Economically, the area has seen a significant decline since the spotted owl was listed as an endangered species, which greatly reduced the output of the lumber industry in the region. Much of the land in the county is owned by the state and federal governments, protected under various statutes, or used for commercial

---

[2] WAC 222-16-086.

forestland. Only three percent of the county is available for residential, commercial, or industrial use.

b. STATUTORY SCHEME

The legislature passed EFSLA as an expedited and centralized process for reviewing potential energy sites in Washington State. The stated policy of the statute is "to recognize the pressing need for increased energy facilities" and promote the creation of such facilities in a way that "will produce minimal adverse effects on the environment, ecology of the land and its wildlife, and the ecology of state waters and their aquatic life." RCW 80.50.010.

In order to promote this policy, the legislature created EFSEC, which evaluates proposals, conducts public hearings and adjudications, and makes a recommendation to the governor. RCW 80.50.030. EFSEC's members include a chair appointed by the governor with the advice and consent of the senate; representatives from the Washington State Department of Ecology, Department of Fish and Wildlife, Department of Commerce, and Department of Natural Resources, as well as the Washington Utilities and Transportation Commission of the locality where the site would be located; and an assistant attorney general as a Counsel for the Environment. Other representatives may become involved as special circumstances require.

Once an application is received, EFSEC must conduct informational public hearings in the county of the proposed site. After these hearings, EFSEC conducts a hearing to determine whether the proposed project is consistent with current land use and zoning regulations. Finally, EFSEC must conduct an adjudicative hearing consistent with the APA that allows interested parties to challenge initial determinations. EFSEC may also conduct additional hearings as necessary. RCW 80.50.090.

After completing these steps, EFSEC submits a recommendation to the governor and, if recommending approval, submits a draft certification agreement. The governor then decides whether to approve the application and execute an SCA, reject the application, or direct EFSEC to reconsider parts of the application. The governor's rejection of the application is final, though a new application can be submitted if there is new information or conditions change. RCW 80.50.100.

An executed SCA acts essentially as a contract between the State and applicant, setting forth the conditions that must be satisfied for implementation of the project. The SCA acts "in lieu" of any other requirements imposed by other regulatory bodies. *See* RCW 80.50.120(3). Further, the provisions of EFSLA can preempt any other rules or regulations promulgated within the state, including local land use rules. RCW 80.50.110(1); *Residents*, 165 Wn.2d 275.

c. REVIEW PROCESS

Here, petitioners do not argue that EFSEC failed to follow the statutorily required steps. This process included a visit to the proposed site, several public hearings, an adjudication under the APA, a land use consistency hearing, and review under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. This process lasted three years and, according to EFSEC, "set a record for length, volume, and number of issues addressed." AR at 29346. These proceedings will be described briefly here with a more detailed account only in certain sections where necessary.

EFSEC conducted two public hearings and received over 300 public comments. In opposition, people were concerned about the environmental impact of development, as well as the scenic and aesthetic impact on the national scenic area. Those in favor of the project viewed wind energy as an environmentally friendly energy source that was coexistent with the surrounding beauty and also emphasized the economic impact of the project.

The land use consistency hearing was conducted as a separate adjudication. The project site is located in an unmapped zone of Skamania County, which means that the county does not have comprehensive zoning that covers the area. Thus, Friends focused much of its argument on the county's comprehensive code, which

designated the land as a conservancy area, and argued that this designation was inconsistent with an energy project. EFSEC found that wind powered energy was consistent with a conservancy designation and, even if not, the zoning code allowed any use in unmapped zones not found to be a nuisance by a court. Wind power had not been found a nuisance by any court and was thus allowable.

The formal adjudication took place over three days and involved 17 parties. EFSEC found that need existed for the project, especially considering RCW 80.50.010's recognition of the "pressing need for increased energy facilities" and legislation that required sustainable energy to account for 15 percent of the State's energy supply by 2020. *See* RCW 19.285.010. Accordingly, it found the main issue to be determining if the project would create a net benefit after considering the impacts.

The "most hotly contested issue" involved the project's impact on the aesthetic and cultural heritage of the area, largely due to the project's visibility from the national scenic area. AR at 29346. EFSEC noted that the project was not the first development to occur in the area, as barge traffic, highways, and rail lines already existed. At the same time, it wanted to preserve the view from the national scenic area as much as possible.[3] Based on these concerns, EFSEC reduced the

---

[3] The parties disputed whether federal law came into play under the Columbia River Gorge National Scenic Area Act. 16 U.S.C. § 544. EFSEC found that the act regulated land only

number of allowable windmills from 50 to 35 and restricted where those windmills could be sited.

EFSEC also addressed concerns regarding the project's impact on wildlife and wildlife habitat. It recognized that although there was a significant wildlife habitat, the project site was not pristine natural land. The Washington Department of Fish and Wildlife (WDFW) acknowledged that with appropriate mitigation measures the project would comply with its guidelines. After considering various arguments and evidence, EFSEC determined that with appropriate mitigation measures and monitoring, the project should go forward.

Finally, EFSEC addressed several issues that are not part of the current challenge, including noise issues, geological challenges, access road issues, cultural and archeological concerns, health and safety planning, and site restoration planning. However, both the adjudicative order and SCA recognized that further study and agreement would be required on several issues. For example, a mitigation parcel was discussed but not formally adopted, and WREP was required to continue discussions with relevant agencies to determine the parcel's adequacy.[4]

---

within the national scenic area and did not apply to the project. That decision has not been challenged.

[4] The parties dispute whether the mitigation parcel was accepted or played any role of EFSEC's determination. This issue will be addressed below.

Based on the adjudicative order, EFSEC recommended that the governor approve the project and provided a draft SCA.[5] Governor Gregoire chose to execute the SCA, which allowed the project to go forward as long as numerous conditions were met. Friends argues that many of these conditions necessarily imply that all issues were not "resolved" within the meaning of the APA. Where relevant, they will be discussed below.

After the governor's decision, Friends timely filed for judicial review as allowed under RCW 80.50.140(1) and the APA. The superior court certified the petition this court. RCW 80.50.140(1).

## II.   ISSUES

(1) Whether WREP's application satisfied chapter 463-60 WAC's requirements that an application include:
- an assessment of the risk of avian collisions "during day and night."
- consideration of the WDFW's *Wind Power Guidelines*.
- a discussion of mitigation measures.[6]

(2) Whether EFSEC complied with chapter 463-62 WAC, which requires:
- an applicant demonstrate no net loss of fish and wildlife habitat.
- fish and wildlife surveys be conducted during all seasons of the year.

---

[5] When EFSEC filed the adjudicative order, the final environmental impact statement (FEIS) had not yet been prepared. The formal recommendation was not made until EFSEC had evaluated and approved of the FEIS.

[6] WASH. DEP'T OF FISH AND WILDLIFE, Wind Power Guidelines (Apr. 2009), http://wdfw.wa.gov/publications/00294/wdfw00294.pdf.

(3) Whether EFSEC formally adopted a specific mitigation parcel for the project.

(4) Whether, by failing to require safety lighting to be radar activated or limit the amount of time turbine blades would spin, EFSEC violated RCW 80.50.010's directive to use available and reasonable methods to produce minimal adverse effects on the environment.

(5) Whether EFSEC erred in finding that the proposed project was consistent with local land use ordinances.

(6) Whether EFSEC erred in delaying review under the Forest Practices Act of 1974 (Forest Practices Act), chapter 76.09 RCW.

(7) Whether the SCA is internally inconsistent in its treatment of the Forest Practices Act.

(8) Whether Friends is entitled to any costs and fees.

## III.   ANALYSIS

### a.   STANDARD OF REVIEW

Under EFSLA, our review is governed by the APA. Although the governor's execution of the SCA would likely be considered the "final decision" triggering review, we have recognized that there are no rules governing how the governor may exercise his or her discretion in approving or rejecting the project. Thus, the decision would arguably be insulated from judicial review despite EFSLA's direction otherwise. Therefore, we consider this process as the granting of a "license," which "includes the agency process respecting the issuance . . . of a

license." RCW 34.05.010(9)(b). Under the APA, relief is granted only in the following situations:

> (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;
> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
> (f) The agency has not decided all issues requiring resolution by the agency;
>
> . . . .
>
> (h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or
> (i) The order is arbitrary or capricious.

RCW 34.05.570(3); *Residents*, 165 Wn.2d at 303-05.

Although it is sometimes difficult to tell which standard Friends is attempting to assert, most of the allegations appear to involve EFSEC's supposed failure to follow its own regulations or resolve all issues requiring resolution and we address the arguments through that lens. We review whether an agency has followed prescribed procedure de novo.[7] An agency

---

[7] *Kittitas County v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011).

fails to resolve all issues when findings are not made on matters that establish the existence or nonexistence of determinative factual matters.[8]

At the outset, it is worth emphasizing EFSLA's unique statutory framework. The legislature granted much discretion to both EFSEC and the governor. The governor's decision to approve or deny does not appear to be subject to any restrictions, and the restrictions placed on EFSEC appear to be largely procedural with some guidance as to what issues should be considered. The framework requires the involvement of various stakeholders, including environmental groups, throughout this process and in EFSEC's ultimate decision. The legislature has recognized the importance of increasing the State's energy output, as have the voters when they called for Washington's energy to be provided by increasingly sustainable sources. When these factors are combined with the deferential nature of review under the APA and the fact that review can easily be certified to this court, the nature of our review is necessarily limited.

---

[8] *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 36, 873 P.2d 498 (1994).

b. CHALLENGES UNDER THE WASHINGTON ADMINISTRATIVE CODE

Friends' challenges under the Washington Administrative Code (WAC) arise out of two separate chapters. The chapters serve slightly different functions, so the challenges are addressed by WAC chapters.

### i. *Chapter 463-60 WAC: Applications for Site Certification*

Friends raises several challenges as to the sufficiency of WREP's application. Applications are discussed in chapter 463-60 WAC, which opens with a general "[p]urpose" section. The chapter

> sets forth guidelines for preparation of applications [under EFSLA] . . . .
>
> The application *shall* provide the council with information regarding the applicant, the proposed project design and features, the natural environment, and the built environment. This information shall be in such detail *as determined by the council* to enable the council to go forward with its application review.

WAC 463-60-010 (emphasis added). The WACs further state that "[t]he applicant *must* address all sections of this chapter and must substantially comply with each section, show it does not apply or secure a waiver from the council." WAC 463-60-115 (emphasis added).

Friends essentially challenges the completeness of the application by quoting several regulations that provide that the application "shall" include certain information. As discussed below, many of the alleged omissions are rather

technical and ignore the broader framework of the application process. The above-quoted WACs show that these regulations are intended to provide "guidelines" as to what information will be considered, with the overall goal of providing EFSEC with enough information to proceed. The application need only substantially comply with the regulations and, ultimately, it is within EFSEC's purview to determine when it has sufficient information to proceed. Though we need not adopt WREP's broad rule that no challenge can be brought for EFSEC's failure to follow its own rules on the completeness of an application, we recognize that the approval process is a broad one. Once the application is submitted, EFSEC must gather public feedback,[9] hold a land use consistency hearing,[10] go through a water and air permitting process,[11] and follow SEPA[12] before making its recommendation. And, even once the project is approved, the SCA can impose additional studies and ongoing requirements. Essentially, the application is the starting point of a longer process and more specific decisions are addressed throughout the process. Any minor deficiencies in the application itself are to be expected and do not warrant

---

[9] RCW 80.50.090(1) (requiring EFSEC to conduct a public hearing).

[10] RCW 80.50.90(2).

[11] RCW 80.50.040(9) (requiring compliance with water pollution controls under chapter 90.48 RCW).

[12] Ch. 43.21C RCW; WAC 197-11-938(1).

reversal. Invalidation of the completed review and recommendation would also defeat the purpose of the extended hearings and ongoing oversight of the project. Further, Friends could not be "substantially prejudiced" by claimed application shortcomings as required by RCW 34.05.570(1)(d). For these reasons, we conclude that WREP substantially complied with the requirements of chapter 463-60 WAC in its application.

## 1. Risk of Nighttime Avian Collisions

Friends argues that WREP did not meet the application requirements of WAC 463-60-332(2)(g), which state that the required "discussion of impacts shall also include . . . [a]n assessment of risk of collision of avian species with any project structures, during day and night, migration periods, and inclement weather." Importantly, the referenced "discussion of impacts" is part of the application, not part of EFSEC's ultimate findings. Thus, Friends' complaint that EFSEC failed to make any specific factual or legal findings based on WAC 463-60-332(2)(g) in its adjudicative order is misfocused. Opening Br. of Pet'rs at 21.

The remaining challenge here seems to focus on the adequacy of the assessment because the application actually did contain an "assessment" of nighttime collision risks. Friends cites to language on the absence of data on nighttime flight patterns but this language refers to the lack of nighttime

*observation* data. In its application, WREP used daytime survey data to create an index based on other similar wind powered projects that allowed it to create a total—both day and night—fatality estimate based on actual reported postconstruction data.[13] A total fatality estimate necessarily includes an assessment of nighttime collision risks, especially since the estimate is based on real collision data, which includes nighttime collisions, at other sites. The methodology used to arrive at this number was part of the application, and EFSEC had every opportunity to and did consider its adequacy. All that WAC 463-60-332(2)(g) requires is that the application contain an "assessment" of collision risk during day and night. EFSEC has discretion to evaluate the methodology used in the assessment. The application contains such an assessment, and WREP satisfied what is required in the application.

2. Conformance with WDFW Wind Power Guidelines

Friends next asserts that EFSEC "erred when it determined that the Applicant satisfied the requirements of the WDFW's Wind Power Guidelines." Opening Br. of Pet'rs at 22. Again, this challenge is based on a regulation in

---

[13] To obtain the estimates, WREP's consultant used its daytime observations to develop an index number that was compared with other already existing sites. Based on this index, postconstruction fatality numbers at other sites, and a regression analysis, the consultant estimated a fatality rate of 0.9 to 2.9 fatalities per megawatt per year. AR at 5086-116. The estimated energy output for the originally proposed project was 75 megawatts, which would make an estimated 67.5 to 217.5 fatalities per year, though the revised estimate would likely be smaller due to the reduced size of the project.

chapter 463-60 WAC and whether EFSEC erred in finding that the requirements satisfied are irrelevant to a challenge as to the sufficiency of the application, especially since the regulation itself does not require full compliance. It states, "The application shall give due *consideration* to any project-type specific guidelines established by state and federal agencies . . . . The application shall describe how such guidelines are satisfied. For example, wind generation proposals shall *consider* [WDFW guidelines]." WAC 463-60-332(4) (emphasis added). This is not a mandatory compliance rule, but simply requires that the application consider these guidelines. EFSEC can then later decide the guidelines with which an applicant must comply.

Furthermore, as the title suggests, the guidelines themselves provide only guidance. The document's introduction states that "[t]he purpose of the WDFW Wind Power Guidelines is to provide consistent statewide guidance for the development of land-based wind energy projects that avoid, minimize and mitigate impacts."[14] WDFW has found WREP's habitat evaluation to be consistent with its guidelines, stating that the "pre-project assessment and avian/bat use surveys *are consistent . . . with the WDFW Wind Power Guidelines*."[15] AR at 15820 (emphasis

---

[14] WIND POWER GUIDELINES, *supra*, at 1.

[15] Friends accuses WDFW of initially finding that the application did not comply with the *Wind Power Guidelines* and changing its statement in response to pressure from WREP. Reply

added). Friends does not meet its burden under the APA to reverse the agency's recommendation.

### 3. Absence of a Wildlife Mitigation Plan

Every application must include a "detailed discussion of mitigation measures." WAC 463-60-332(3). Friends faults WREP for submitting an application with minimal discussion of mitigation measures. While the application did not fully detail the mitigation measures, such a requirement would be unrealistic. The application is the first step in a longer process. In many situations, as here, the final size and location of the site is not known until after the adjudication, making a full discussion of specific mitigation measures in the application unnecessary. Moreover, the adjudication process serves to bring to light more specific environmental concerns that may need to be mitigated. The WACs require that an application contain a discussion of proposed mitigation measures. WREP's application contained a discussion, which EFSEC apparently found sufficient to substantially comply with its requirements. Further, mitigation measures are required by both the adjudicative order and SCA, which means that

---

Br. of Pet'rs at 20 n.62. Not only is this argument raised in the reply brief, its implication that WREP exerted undue influence seems unjustified. The first letter reflects a first impression of the initial application and, rather than suggesting that the project should not go forward, WDFW appeared to simply want additional information. The subsequent chain of letters suggests that WREP addressed these initial concerns with additional materials and documentation that WDFW found satisfactory. *See* AR at 17973-75, 4026-47, 20222-28. Nothing in the record suggests that WREP improperly persuaded WDFW to change its opinion.

adequate mitigation is a condition required for the completed project. Friends has not met its burden under the APA to show that WREP did not substantially comply with WAC 463-60-332(3).

Friends also seeks remand because of apparent inconsistencies in the amount of impacted wildlife habitat, which in turn affects the mitigation requirements in WAC 463-60-332(3). As with the above sections, any inconsistencies in the adjudicative order are not properly addressed in a challenge to the application under chapter 463-60 WAC. However, when the record is viewed in its entirety, it becomes clear that the claimed inconsistencies are the result of typographical errors or misstatements and that, overall, the numbers have been fairly consistent throughout: the total project area is roughly 1,152 acres; the area subject to micrositing (i.e., where windmills might ultimately be located) is roughly 384 acres; and roughly 108 acres will be developed, but only about 57 acres will be permanently developed. Any differences that exist are insignificant, making remand unnecessary on this issue.

### ii. *Chapter 463-62 WAC: Construction and Operation*

Chapter 463-62 WAC's purpose is to "implement" the legislative policy found in RCW 80.50.010, namely, to balance the need for new energy production with environmental and societal considerations. "The council shall apply these

rules to site certification agreements issued" by the council. WAC 463-62-010(1). Moreover, "[t]he provisions of this chapter shall apply to the construction and operation of energy facilities." WAC 463-62-010(2).

Friends' arguments here misunderstand the nature of the chapter by pointing to alleged deficiencies in WREP's preapplication wildlife survey, as well as EFSEC's adjudicative order. These regulations apply to the SCA and the later ongoing operation and construction of the facility and do not control the application and review process. As discussed in greater detail below, we find no basis in the regulations supporting Friends' arguments.

### 1. No Net Loss

EFSLA requires that projects result in "no net loss" of wildlife habitat. WAC 463-62-040(2)(a). Friends notes that the no net loss rule is not mentioned in the application or the EFSEC order and argues that EFSEC violated the APA with this omission. However, as discussed above, the no net loss rule is part of the ongoing operation standards for energy facilities, not an application requirement. Thus, the topic did not need to be addressed in the EFSEC order as long as it is required by the SCA and complied with by WREP. The SCA requires that WREP submit a mitigation plan prior to site preparation and outlines several ways in which WREP can satisfy the no net loss rule. For example, WREP could establish a mitigation

21

parcel on its own or contribute money to a third party. AR at 36709. At this stage, Friends has not shown that WREP failed to comply with the no net loss rule.

2. EFSEC Wildlife Survey and Assessment Requirements

WAC 463-62-040(2)(f) states that in order to achieve EFSEC's intent of no net loss of habitat functions, "[f]ish and wildlife surveys shall be conducted during all seasons of the year to determine breeding, summer, winter, migratory usage, and habitat condition of the site." Friends relies on this quoted language to argue that surveys are required "'during all seasons of the year to determine . . . migratory usage . . . of the site.'" Opening Br. of Pet'rs at 19 (alterations in original), *also quoted in* Reply Br. of Pet'rs at 16. From this language, Friends argues that because WREP did not conduct surveys during the migratory period of the olive-sided flycatcher, the requirement to "determine migratory usage" was not satisfied.

However, this requirement is part of the ongoing oversight of the project and is not relevant to the sufficiency of preapplication studies. In essence, WAC 463-62-040(2)(f) requires that the SCA and the ongoing oversight mechanisms ensure that WREP studies wildlife impacts in all seasons. If, for example, an unexpectedly high number of olive-sided flycatcher mortalities occur, WREP might be required to implement additional mitigation measures. This section does not, however,

provide a basis for challenging preapplication wildlife studies. Friends had the opportunity to submit contradictory evidence during the adjudication. EFSEC considered the evidence submitted by Friends and determined that the benefits of the project outweighed the costs.

Even if the regulation did apply as Friends suggests it does, no violation has been shown. When the regulation is read as a whole, it requires the surveys to be conducted throughout the year so as to understand flight patterns during different seasons. Here, as Friends acknowledges, surveys were conducted between September 11 and November 4, 2004; May 15 and July 14, 2006; and December 4, 2008 and May 29, 2009. Thus, WREP conducted surveys during 11 months of the year and all four seasons. Friends' ability to find a roughly two-month period where no surveys were conducted fails to demonstrate that surveys were not "conducted during all seasons," especially since there is no indication that WREP intentionally skipped this period of time in its studies. This argument was raised in the process. EFSEC properly considered the conflicting evidence and made its recommendation in light of the entire record. Friends thus fails to meet its burden under the APA.

c. EXISTENCE OF A MITIGATION PARCEL

As the no net loss rule suggests, mitigation parcels are often required. *See* WAC 463-62-040. During the adjudication, WREP proposed a 100-acre mitigation parcel. Friends argues that WREP proposed the site too late in the adjudication for Friends to contest the site and that EFSEC made contradictory statements as to the nature of its decision regarding the mitigation parcel. Though none of the parties address ripeness, this dispute does not appear to be ripe. The only finding EFSEC made as to habitat mitigation was that it was required.[16] Similarly, the SCA acknowledges that a parcel has been proposed but makes no finding as to the adequacy of that parcel, instead requiring WREP to work with WDFW to take appropriate mitigation measures. As the actual mitigation measures are yet to be determined, there appears to be no agency action for Friends to challenge.[17]

---

[16] Friends also argues that EFSEC made inconsistent statements about the mitigation parcel, making it impossible to tell whether it was accepted or not. However, this argument relies on selective quotation of the record. For example, it cites EFSEC manager Al Wright's statement that "EFSEC had 'considered and favorably regarded' the mitigation parcel" as evidence that the parcel played a role in EFSEC's decision. Opening Br. of Pet'rs at 39 (citing AR at 28720). However, the sentence concludes that "[EFSEC] did not make a finding on that particular issue because it was never culminated into a stipulated agreement to the Council." AR at 28720. Read as a whole, EFSEC's order and the SCA state that the parcel might be adequate and that further negotiations would need to occur between WREP and WDFW before a final determination was made.

[17] EFSEC and the governor make the alternative argument that offering the mitigation parcel in rebuttal testimony was proper because the testimony was filed on December 16, 2010, and the adjudication did not begin until January 3, 2011. We need not address this argument because, regardless of whether this was enough to time for Friends to prepare a challenge to the parcel, EFSEC itself held that the parcel had not been formally offered and the issue is not ripe.

24

Friends also makes the argument that deferring acceptance of the mitigation parcel essentially insulates the decision from scrutiny or participation by either Friends or by the public. WREP appears to agree with this argument, suggesting that opponents have already had their chance to challenge the project. Resp. Br. of Intervenor—Resp't WREP at 35-38. EFSEC and the governor make a more measured response, writing that Friends will still have an opportunity for input. Br. of Resp'ts at 34, 65. Although it is unclear what the scope of Friends' involvement can or will be in the future, it is premature to address the issue here. Adopting Friends' position would require that the final order and SCA completely resolve every potential issue. But complete resolution at the planning stage would be impractical due to the complicated nature of the projects and the likelihood that additional issues will arise later. Moreover, EFSEC has discretion to seek public comment or conduct additional adjudications if necessary. Friends may have ample opportunity for continued participation. The issue is not ripe for our resolution.

### d. AESTHETIC, HERITAGE, AND RECREATIONAL MITIGATION

Friends next argues that the project violates RCW 80.50.010's directive to use "available and reasonable methods" so that approved projects "produce minimal adverse effects on the environment." These potential adverse effects include aesthetic, heritage, and recreational resources. RCW 80.50.010(2); WAC

463-47-110(1)(b). Friends points to two potential measures that were overlooked: radar-activated safety lighting and a reduction in the amount of time turbine blades would spin.[18]

Friends' argument seems to be that the statute's use of "minimal" requires EFSEC to impose every mitigation measure so that the impact is objectively minimized. However, this argument reflects an extreme reading of the statute and misunderstands EFSEC's role in balancing competing interests. EFSEC did restrict the number and location of turbines largely in response to aesthetic concerns. Further, both the adjudicative order and the SCA require additional aesthetic mitigation tactics, including the use of micrositing and limiting how onsite maintenance buildings will look. These measures are sufficient to show compliance with RCW 80.50.010. And since the proposal was reduced and conditioned, the argument, in essence, is that these measures were not enough to satisfy the statute. However, since the burden is on Friends to establish noncompliance, we reject the challenge. RCW 34.05.570(1)(d).

---

[18] The requirement to "produce minimal adverse effects on the environment" is also stated in WAC 463-14-020(1), as well as alluded to in WAC 463-60-085(1). Friends reiterates this same argument with regards to these WAC sections. These arguments are unpersuasive for the same reasons described here.

e. CONSISTENCY WITH COUNTY CODE

*i. Relevant Facts*

Before WREP submitted its application, the county sought to update its zoning code to specifically authorize wind generation facilities and then issued a mitigated determination of nonsignificance, which would have avoided SEPA review for the changes. However, the county's hearing examiner found this inappropriate and determined that SEPA review would be required before the code changes could be adopted. The county, citing budgetary concerns, decided not to challenge that decision or go through SEPA review. Because of this action, WREP submitted an application through EFSLA.

The land use consistency hearing occurred on May 7, 2009, and was conducted as an adjudication under the APA. In the adjudicative order, EFSEC chastised Friends for raising numerous "arguments [that] have little or no relevance." AR at 29339. Ultimately, the dispute largely centered on the legal effect of the county's comprehensive plan and various forest practices rules. EFSEC dismissed these arguments and found that the project complied with the county's code because the project site was located in an unmapped zone and all activities not declared a nuisance by a court were allowed in unmapped zones. It

27

also found that renewable energy fit with the comprehensive plan's conservancy designation. Friends now challenges the determination of consistency.

### ii. Analysis

After the informational public hearing, EFSEC is required to "conduct a public hearing to determine whether or not the proposed site is consistent and in compliance with city, county, or regional land use plans or zoning ordinances." RCW 80.50.090(2). If consistent, the local jurisdiction cannot subsequently amend any rules to affect the proposed site. If inconsistent, EFSEC can preempt the conflicting regulations and allow the project to move forward. RCW 80.50.110(2); *Residents*, 165 Wn.2d at 311 n.13. A certificate from local authorities is considered "*prima facie* proof of consistency and compliance with such land use plans and zoning ordinances *absent contrary demonstration by anyone present at the hearing.*" WAC 463-26-090 (second emphasis added).

The parties make numerous arguments regarding whether the project is consistent with Skamania County's comprehensive plan or if consistency with the comprehensive plan is even required. These arguments are unnecessary, however, as the project is authorized outright by the local zoning code. Under the county's zoning code, areas "where no formal adoption of any zoning map has taken place will be designated as unmapped." Skamania County Code (SCC) § 21.64.010. In

28

these unmapped areas, "all uses which have not been declared a nuisance by statute, resolution, ordinance, or court of jurisdiction are allowable." SCC § 21.64.020. The code's conditions are satisfied here because the proposed project site lies outside of the formal zoning map and because wind farms have not been declared a nuisance by any of the relevant authorities. Using a disjunctive, EFSLA requires only that the project be consistent with either "land use plans *or* zoning ordinances." RCW 80.50.090(2) (emphasis added). Because the use is allowed by the zoning ordinance, it need not be consistent with "land use plans." Thus, we affirm EFSEC's determination of consistency and need not address the majority of the remaining arguments.

### iii. Moratorium

At the time of the EFSEC hearing, Skamania County had passed a moratorium prohibiting, in relevant part, the "acceptance and processing of [SEPA] checklists related to forest practice conversions." AR at 16856. Friends argues that this moratorium is a "land use regulation" and is inconsistent with the project. EFSEC and WREP make a threshold argument that the moratorium is not a "zoning ordinance" under EFSLA, which would mean that its consistency with the project is irrelevant.

EFSLA defines a "zoning ordinance" as "an ordinance of a unit of local government regulating the use of land and adopted pursuant to chapter . . . 36.70[] or 36.70A." RCW 80.50.020(22). In addition to being passed by a local unit of government, the moratorium is entitled *"Ordinance* 2010-10" (emphasis added) and it explicitly references chapters 36.70 and 36.70A RCW. *See* AR 16854-856. However, the moratorium does not regulate how land is *used*. Rather, it regulates the county's processing of SEPA checklists and is not land use regulation within the definition provided by EFSLA.

But even if the moratorium were a land use regulation within the meaning of EFSLA, it would not be inconsistent with the project because the moratorium only restricts the county's acceptance and processing of SEPA checklists. Under the county's code, a SEPA checklist is "not needed if . . . SEPA compliance has been initiated by another agency." SCC 16.04.070(A). Here, EFSEC initiated SEPA review and the county will not need to accept or process a SEPA checklist. Since the county will neither accept nor process any SEPA checklists, the moratorium is not implicated. It should also be noted that the moratorium appears to have been directed more toward stopping residential expansion than preserving forestland or prohibiting all construction. Thus, we hold that the moratorium does not apply to this project.

### f. FAILURE TO FULLY RESOLVE ISSUES

Friends alleges that EFSEC's postponement of two remaining issues means that it failed to resolve all contested issues, thereby warranting remand. The first issue involves the fact that the micrositing will take place, making the final location of the windmills unknown. However, Friends withdrew this argument in its reply brief based on the admission that the windmills will be located in predefined corridors. We need not address this issue.

The remaining issue is whether EFSEC's decision to defer review of compliance with the Forest Practices Act was improper. The SCA requires an application to be submitted 60 days before engaging in certain activities. This requirement continues throughout the life of the project. The Department of Natural Resources (DNR), which typically processes applications under the Forest Practices Act, has input on any permitting under the Act. WREP is required to coordinate with DNR before submitting final applications to EFSEC. As in much of its briefing, Friends appears to argue that every subissue must be resolved before an issue is "dispos[ed] of" for the purposes of WAC 463-30-320(6). No authority is cited for the idea that the Forest Practices Act must be dealt with in an EFSEC adjudication. To the extent that the Act's applicability is a "contested issue[]," WAC 463-30-320(6), EFSEC resolved this issue by requiring continuing

31

compliance with the Act. Also, by requiring applications to be submitted 60 days before engaging in forest practices, EFSEC mirrored the statute's time frame for submitting applications rather than requiring the applications to be submitted years in advance. We hold that EFSEC sufficiently resolved this issue.

As discussed above in section III.C, Friends' remaining concerns about the availability of public participation and judicial review are not ripe.

### g. SCA'S INTERNAL INCONSISTENCY

Friends further asserts that the SCA is inconsistent in its treatment of Forest Practices Act compliance. This inconsistency is explained by the different nature of the two quoted sections. Section IV.L of the SCA relates to the construction of the facility, while section VII.E relates to the ongoing operations at the facility and any later activities that might involve forest practices. AR 29293, 29302. Even if this did not fully explain the slightly different language, it is unclear why this inconsistency would cause sufficient prejudice to warrant reversal. The Forest Practices Act applies and any problem at some future time would have to be resolved on the specific facts at issue.

## h. ATTORNEY FEES AND COSTS

Friends also seeks costs and fees. However, Friends is not a prevailing party and is therefore not entitled to recover its costs and fees under the equal access to justice act, RCW 4.84.350.[19]

## IV. CONCLUSION

Because Friends fails to meet its burden under the APA, we affirm EFSEC's recommendation and the governor's acceptance and approval of the WREP project.

---

[19] Friends also argues that regardless of whether it prevails, it should be entitled to one-half the cost of preparing and transmitting the administrative record under RCW 34.05.566(5)(a) because respondent parties unreasonably refused to stipulate to a shortened record. We also deny this request. Friends spent a great deal of time and money to create this record and, given the number of parties and issues, it would have been difficult and time-consuming to arrive at a stipulated record, especially before the issues had been narrowed by any stipulation. Friends' request for one-half the cost of preparing and transmitting the adjudicative record is denied.

WE CONCUR: