FILED
COURT OF APPEALS
DIVISION II

2015 AUG 25 AM 8: 44

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| COLUMBIA RIVERKEEPER; and NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | No. 46130-7-II |
| Appellants, | |
| SIERRA CLUB, | |
| Plaintiff, | PUBLISHED OPINION |
| v. | |
| PORT OF VANCOUVER USA; JERRY OLIVER, Port of Vancouver USA Board of Commissioners President; BRIAN WOLFE, Port of Vancouver USA Board of Commissioners Vice President; and NANCY I. BAKER, Port of Vancouver USA Board of Commissioners Secretary, | |
| Respondents. | |

MAXA, J. — Columbia Riverkeeper and the Northwest Environmental Defense Center (Riverkeeper) appeal the trial court's partial summary judgment order dismissing two of their six claims against the Port of Vancouver. Riverkeeper's claims relate to the Port's agreement to lease property to the Tesoro Corporation and Savage Companies (Tesoro/Savage) for construction of a crude oil transportation facility. Riverkeeper asserts that the Port violated the

State Environmental Policy Act (SEPA), chapter 43.21C RCW, in entering into the lease agreement.

The parties agree that the Port's execution of the lease is contingent on the project's certification by the Energy Facility Site Evaluation Council (the Council)[1] following preparation of an environmental impact statement (EIS) and ultimate approval by the governor, pursuant to the Energy Facility Site Locations Act (EFSLA), chapter 80.50 RCW. However, Riverkeeper claims that the Port violated SEPA by entering into an agreement to lease the property to Tesoro/Savage for the project before the Council issued its EIS. Riverkeeper also claims that the Port violated EFSLA regulations because the lease agreement with Tesoro/Savage limits the Port's choice of reasonable alternatives available for the facility.

We hold that the Port's decision to enter into the lease agreement (1) was exempt from SEPA's EIS requirement under RCW 80.50.180, an EFSLA provision, because the lease agreement involved the approval of the location of an energy facility; and (2) did not violate WAC 197-11-070(1), a SEPA regulation, because the lease agreement does not limit the choice of reasonable alternatives available to the Council and the governor for the facility during the site certification process. Accordingly, we affirm the trial court's order granting partial summary judgment in favor of the Port.

## FACTS

In late 2012, the Port solicited proposals from companies interested in developing a crude oil terminal on its property. In early 2013, it selected Tesoro/Savage as the most suitable

---

[1] The parties refer to the Council by the acronym EFSEC. We use the short form "the Council" in order to prevent any confusion with the "Energy Facility Site Locations Act" (EFSLA), which we reference throughout the opinion.

companies for such a project. The Port negotiated a lease agreement with Tesoro/Savage and then approved that agreement at a public meeting in July 2013. However, because of concerns over the procedure used at that meeting, the Port voted a second time to approve the lease agreement at another public meeting in October 2013.

The lease agreement provides for a 10-year lease (extendable for two five-year terms at Tesoro/Savage's option) following construction of the terminal facility. But before the construction or lease periods begin, either party may terminate the agreement if any conditions precedent are not satisfied. The primary condition precedent is that "all necessary licenses, permits and approvals have been obtained for the Permitted Use." Clerk's Papers (CP) at 288. This provision requires Tesoro/Savage to acquire full regulatory approval for its operations before it may begin construction or use of the land.[2] Therefore, either the Port or Tesoro/Savage may terminate the agreement before the lease begins if Tesoro/Savage cannot obtain full regulatory approval.

The lease agreement describes the activities to be allowed on the land, which include the loading and unloading of crude oil from rail lines, the storage of crude oil, and the loading of crude oil onto marine vessels. The agreement also requires Tesoro/Savage to maintain pollution liability insurance with limits of $25 million.

Before approving the lease agreement, the Port did not prepare an EIS and did not formally assess whether one was required under SEPA. The chair of the Council advised the Port that the Council would have sole responsibility for environmental review as part of the site

---

[2] The other condition precedent involves preparation of a baseline environmental assessment to determine the extent to which the land is already contaminated, which expressly benefits only Tesoro/Savage.

3

certification process under EFSLA. After the parties executed the lease agreement, Tesoro/Savage applied to the Council for site certification as required under EFSLA. The Council determined that environmental review under SEPA was necessary and declared that it would prepare an EIS for the project.

Riverkeeper filed suit against the Port, asserting six claims relating to the Port's execution of the lease agreement. Claim five alleged that the Port "violated SEPA by approving the lease for the petroleum products terminal before the completion of either a determination of nonsignificance or an EIS." CP at 14. Claim six alleged that the Port "violated SEPA by taking action – approval and execution of the lease for the proposed petroleum products terminal – that limits the choice of reasonable alternatives concerning the proposal before completion of either a determination of nonsignificance or an EIS." CP at 15.

The trial court granted the Port's summary judgment motion regarding these two claims. The trial court ruled that RCW 80.50.180 exempts execution of the lease agreement from SEPA's EIS requirement and that execution of the lease agreement did not limit the reasonable range of alternatives to be considered in the review of the project. The trial court subsequently entered final judgment on claims five and six under CR 54(b).

Riverkeeper appeals the trial court's grant of partial summary judgment on claims five and six.

## ANALYSIS

A.    STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Int'l Longshore & Warehouse Union, Local 19 v. City of Seattle* *(ILWU)*, 176 Wn. App. 512, 519, 309 P.3d 654 (2013). Summary judgment is proper if there are

4

no issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

B.    SCOPE OF EFSLA EXEMPTION

Riverkeeper argues that SEPA applies to the Port's proprietary decision to lease public property to Tesoro/Savage, and therefore that the Port violated SEPA by entering into the lease agreement before completion of an EIS. We disagree because under RCW 80.50.180, the Port's decision to enter into the lease agreement involved the approval or authorization of the location of an energy facility and therefore is exempt from SEPA's EIS requirement.

1.    SEPA EIS Requirement

In order to ensure that the government agencies consider the impact of their actions on the natural environment, SEPA requires agencies to submit an EIS before pursuing "major actions significantly affecting the quality of the environment." RCW 43.21C.030(2)(c); *see also Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. 616, 634, 246 P.3d 822 (2011). The EIS is a "detailed statement" describing

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

RCW 43.21C.030(2)(c).

An EIS serves to enhance agency decision making both by informing the agency directly and by facilitating public engagement with the agency:

> The EIS process enables government agencies and interested citizens to review and comment on proposed government actions, including government approval of private projects and their environmental effects. . . . An environmental impact statement is more than a disclosure document. It shall be used by agency officials in conjunction with other relevant materials and considerations to plan actions and make decisions.

WAC 197-11-400(4).

Because projects often involve multiple agencies, Department of Ecology regulations provide for designation of a "lead agency" for purposes of preparing an EIS for any project. WAC 197-11-050. The lead agency "shall be the agency with main responsibility for complying with SEPA's procedural requirements and shall be the only agency responsible for: (a) The threshold determination [of significance]; and (b) Preparation and content of environmental impact statements." WAC 197-11-050(2). This ensures that there will be only one EIS for each project. *See* WAC 197-11-060(3)(b).

2.   EFSLA Certification Process

EFSLA, codified at chapter 80.50 RCW, "governs the location, construction, and operation conditions of energy facilities in Washington." *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 284, 197 P.3d 1153 (2008). The term "energy facility" is defined to include certain types of "energy plants." RCW 80.50.020(11), (12). This definition includes any facility "which will have the capacity to receive more than an average of fifty thousand barrels per day of crude or refined petroleum or liquefied petroleum gas which has been or will be transported over marine waters." RCW 80.50.020(12)(d). Tesoro/Savage's project falls within this definition.

A primary focus of EFSLA is to establish a process for certifying construction of energy facilities. *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 284-85. The EFSLA created the Council to administer the site certification process. RCW 80.50.030; *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 285. The Council is composed of representatives from various state agencies and also includes a representative of the county, city, or port district[3] in which the facility is proposed to be located. RCW 80.50.030(3)-(6).

Under EFSLA, the Council administers the process of certifying construction sites for energy facilities. RCW 80.50.040, .060(1). The Council receives, processes, and evaluates applications for site certification under EFSLA and the regulations and guidelines it adopts. RCW 80.50.040(5)-(11); *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 285. The site certification process begins when an applicant requests review of a proposed energy facility. RCW 80.50.071(1). The applicant provides detailed information about the project and the natural environment at the proposed site, WAC 463-60-010, and the Council determines whether preparation of an EIS is necessary. WAC 463-47-060, 070. If needed, the Council prepares an EIS.[4] WAC 463-47-090(1).

The Council ultimately recommends that the governor approve or deny the application. RCW 80.50.100(1). If the Council recommends approval, it has authority to impose conditions on certification to implement the provisions of EFSLA. RCW 80.50.100(2). The governor either approves the application, rejects the application, or directs the Council to reconsider

---

[3] Port districts have a nonvoting representative on the Council for review of proposed energy facilities on port property. RCW 80.50.030(6).

[4] If an EIS is required, the Council operates as the lead agency for EIS purposes if other agencies are involved in an energy facility project. WAC 197-11-938(1).

certain aspects of the certification. RCW 80.50.100(3). EFSLA places only procedural limitations on the Council's evaluation of an energy facility application and places no restrictions at all on the governor's decision. *Friends of the Columbia Gorge, Inc. v. State Energy Facility Site Evaluation Council*, 178 Wn.2d 320, 334, 310 P.3d 780 (2013).

The legislature designed EFSLA certification to be the exclusive method for approving the construction of energy facilities. RCW 80.50.110 provides that EFSLA supersedes conflicting state laws and regulations and expressly preempts energy facility certification decisions by other governmental entities. *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 285. Site certification under EFSLA authorizes the applicant to construct and operate an energy facility without obtaining a permit or certification from any other governmental entity. RCW 80.50.120(3); *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 285.

3.    Interpretation and Application of RCW 80.50.180

     a.    Statutory Language

EFSLA expressly exempts certain actions involving energy facilities from SEPA's EIS requirement. RCW 80.50.180 provides that

> all proposals for legislation and other actions of any branch of government of this state, including state agencies, municipal and public corporations, and counties, to the extent the legislation or other action involved *approves, authorizes, permits*, or establishes procedures solely for approving, authorizing or permitting, the *location*, financing or construction of any *energy facility* subject to certification under chapter 80.50 RCW, shall be exempt from the "detailed statement" [EIS] required by RCW 43.21C.030.

(Emphasis added.) The issue here is whether the Port's entry into a lease agreement involving the construction of an energy facility constitutes an action "approving," "authorizing," or "permitting" the location of that facility.

b.  Principles of Statutory Interpretation

Statutory interpretation is a matter of law that we review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). The primary goal of statutory interpretation is to determine and give effect to the legislature's intent. *Id.* at 762. To determine legislative intent, we first look to the plain language of the statute. *Id.* We consider the language of the provision in question, the context of the statute in which the provision is found, and related statutes. *Protect the Peninsula's Future v. Growth Mgmt. Hearings Bd.*, 185 Wn. App. 959, 969, 344 P.3d 705 (2015). When the statute at issue or a related statute includes an applicable statement of purpose, the statute should be read in a manner consistent with that stated purpose. *Id.* at 969-70.

If the statutory language is unambiguous, we apply that statute's plain meaning as an expression of legislative intent without considering extrinsic sources. *Jametsky*, 179 Wn.2d at 762. We will not rewrite unambiguous statutory language or add language to an unambiguous statute under the guise of interpretation. *Protect the Peninsula's Future*, 185 Wn. App. at 970. And we "must not add words where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003). Instead, we construe statutes assuming that the legislature meant exactly what it said. *In re Marriage of Herridge*, 169 Wn. App. 290, 297, 279 P.3d 956 (2012).

c.  Ordinary Meaning Analysis

RCW 80.50.180 expressly exempts from SEPA's EIS requirement any action that "approves, authorizes [or] permits" the location of an energy facility. The ordinary meaning of "approve" is "to express often formally agreement with and support of or commendation of as meeting a standard." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 106 (2002). "Authorize" ordinarily means "to endorse, empower, justify, or permit by . . . some recognized or proper

authority." WEBSTER'S at 146. And "permit" ordinarily means "to consent to expressly or formally [or] grant leave for or the privilege of." WEBSTER'S at 1683. Taken together, these three terms broadly refer to any actions that formally grant a right or privilege necessary to move a project forward.

Here, the Port's lease agreement formally grants Tesoro/Savage the right to move forward with a project to construct an energy facility at a particular location on Port property, subject to certain conditions. Therefore, the RCW 80.50.180 exemption unambiguously applies to the lease agreement.

Riverkeeper argues that the phrase "approves, authorizes [or] permits" in RCW 80.50.180 refers only to "regulatory" actions and not to "proprietary" actions. However, there is no basis in the statutory language for making this distinction. RCW 80.50.180 potentially applies to "all . . . other actions," not to "all other *regulatory* actions." The statute uses the broad phrase "approves, authorizes [or] permits," not "regulates." Riverkeeper's argument is inconsistent with the plain statutory language, and adopting that argument would require us to add language to RCW 80.50.180.

d.   Context Analysis

Riverkeeper argues that distinguishing between regulatory actions and proprietary actions is supported by interpreting the statutory language in the context of other EFSLA and SEPA provisions.

Specifically, Riverkeeper asserts that (1) the fundamental purpose of EFSLA is to centralize the *regulatory* process for energy facilities, citing RCW 80.50.110(2) (EFSLA preempts only the "regulation and certification" of energy facilities by other governmental entities) and RCW 80.50.120(3) (stating that the issuance of a certificate shall be in lieu of any

"permit, certificate or similar document," which are issued pursuant to regulatory authority); (2) a narrow interpretation of RCW 80.50.180 is consistent with a core policy of SEPA,[5] which Riverkeeper claims is to ensure that decision makers like the Port have the information necessary to make responsible environmental decisions before selling or leasing public property, *see ILWU*, 176 Wn. App. at 522 (stating that the "fundamental idea of SEPA" is to "prevent government agencies from approving projects and plans before the environmental impacts of doing so are understood"); and (3) other sections of EFSLA's and SEPA's implementing regulations show that agencies other than the Council can have SEPA responsibilities for energy facilities, citing RCW 80.50.175(4) and WAC 197-11-938(1), which was adopted for EFSLA purposes in WAC 463-47-020.

However, one of the legislature's stated purposes in enacting EFSLA was "[t]o avoid costly duplication in the siting process and ensure that decisions are made timely and without unnecessary delay." RCW 80.50.010(5). The Port argues that if proprietary actions relating to energy facilities were not exempt, a governmental entity taking such actions would be required to prepare an EIS in addition to the EIS that the Council is required to prepare. Riverkeeper responds that it is not claiming that the Port should have to prepare its own EIS, but only that the Port must wait until the Council completes its EIS before deciding whether to lease the property. But, as in this case, the developer of an energy facility may require a written lease agreement before proceeding with its application under EFSLA. In that situation, if leasing property was not exempt under RCW 80.50.180, a governmental entity may have no choice but to prepare a duplicative EIS before entering into the lease.

---

[5] Riverkeeper notes that under RCW 43.21C.030(1), all Washington laws must be interpreted in accordance with the policies set forth in SEPA.

11

In addition, RCW 43.21C.030(2)(c) and RCW 80.50.180 use almost identical language regarding the general scope of those statues. Under RCW 43.21C.030(2)(c), an EIS is required for "proposals for legislation and other major actions." Similarly, RCW 80.50.180 applies to "all proposals for legislation and other actions." Consideration of these two statutes together suggests that RCW 80.50.180 exempts all activities that might otherwise be subject to SEPA's EIS requirement.

We hold that interpreting RCW 80.50.180 in the context of various EFSLA and SEPA provisions does not clarify the plain meaning of "approve, authorize, [or] permit" as used in that statute. Riverkeeper's arguments at best show that the legislature could have exempted regulatory actions from the EIS requirement without conflicting with other statutory provisions. But the legislature did not limit RCW 80.50.180 in that manner. We will not add language to the statute based on context arguments that cut both ways.

Moreover, it is not clear that conditioning approval on the Council's EIS review, rather than EIS review by the Port, conflicts with the policies set forth in SEPA. As long as an EIS is prepared and the review is completed, the policies underlying SEPA review appear to be satisfied. *See* RCW 43.21C.010, .020. And applying the RCW 80.50.180 exemption to all actions, regulatory or proprietary, is consistent with the legislature's clear intent to centralize the authorization process for energy facilities with the Council. Limiting the exemption to regulatory actions potentially could undermine that purpose.

We hold that based on the plain language of RCW 80.50.180, the Port's decision to enter into a lease agreement with Tesoro/Savage relating to the construction of an energy facility was exempt from SEPA's EIS requirement.

### B.    LIMITING THE CHOICE OF REASONABLE ALTERNATIVES

Even if the Port is exempt from SEPA's EIS requirement, Riverkeeper argues that the Port violated WAC 197-11-070(1) by entering into the lease agreement because the lease terms limited the choice of the Port's reasonable alternatives before completion of an EIS. We disagree because the lease agreement did not limit *the Council's* or *the governor's* choice of reasonable alternatives regarding the certification process.

### 1.    SEPA/EFSLA Regulations

WAC 197-11-070(1) limits the actions of a governmental entity during the SEPA process. That regulation provides,

> Until the responsible official issues a final determination of nonsignificance or final environmental impact statement, no action concerning the proposal shall be taken by a governmental agency that would:
> . . .
> (b) Limit the choice of reasonable alternatives.

WAC 197-11-786 defines "reasonable alternative" as

> an action that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation. Reasonable alternatives may be those over which an agency with jurisdiction has authority to control impacts, either directly, or indirectly through requirement of mitigation measures.

*See also King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn.2d 161, 184-85, 979 P.2d 374 (1999). The Council has expressly adopted these regulations for the EFSLA process. WAC 463-47-020.

In an EIS, an agency considers three categories of alternatives: no action, other reasonable courses of action, and mitigation measures. WAC 197-11-792(2)(b).

2. Applicability of WAC 197-11-070(1)

Initially, WAC 197-11-070(1) states that a governmental agency cannot take an "action" that limits the choice of reasonable alternatives. Under WAC 197-11-704(2)(a)(ii), leasing property constitutes an "action" under SEPA. However, the Port's lease agreement is contingent on Tesoro/Savage obtaining certification under EFSLA. Riverkeeper argues that despite this contingency, entering into the lease agreement constituted a SEPA "action." We agree.

In *Magnolia Neighborhood Planning Council v. City of Seattle*, the city approved a plan for residential development on property the city had not yet obtained. 155 Wn. App. 305, 308, 230 P.3d 190 (2010). Division One of this court held that this approval was a "project action" under WAC 197-11-704 because it was "a decision on a specific construction project, located in a defined geographic area." 155 Wn. App. at 314. The court also noted that the city's approval of the plan had a "binding effect" because once the city obtained the property, the city would be bound to use the property based on the approved plan. *Id.* at 317.

On the other hand, in *ILWU* the city entered into a memorandum of understanding that contemplated the use of public funds for a sports arena. 176 Wn. App. at 514. Division One held that the memorandum of understanding was not a "project action" under WAC 197-11-704 because the memorandum was merely a preliminary step to set forth an arena proposal that was sufficiently definite to allow further study. *Id.* at 520-21. Further, unlike in *Magnolia*, the memorandum did not limit or control the city's future decisions and therefore did not have a binding effect. *ILWU*, 176 Wn. App. at 523.

Here, the Port's lease agreement is much more like the binding plan approval in *Magnolia* than the nonbinding memorandum of understanding in *ILWU*. As in *Magnolia*, the lease agreement represents a decision on a specific construction project in a specific location.

155 Wn. App. at 314. Further, upon certification by the Council the lease agreement essentially will be binding on the Port. As a result, we hold that the Port's entry into the lease agreement with Tesoro/Savage was an "action" under SEPA and therefore was subject to WAC 197-11-070(1)(b).

3. Lease Agreement's Effect on Reasonable Alternatives

Riverkeeper argues that the lease agreement significantly limits the Port's choices of reasonable alternatives for Tesoro/Savage's energy facility. Specifically, Riverkeeper asserts that the lease agreement commits the Port to (1) the location of the facility, (2) the design of the facility, (3) the permitted uses of the site, (4) site closure and reclamation requirements, (5) the dedication of berths to ships servicing the terminal, and (6) the amount of pollution liability insurance Tesoro/Savage must obtain. Riverkeeper also points out that the lease agreement precludes the Port from leasing the property to any other tenant.[6] In contrast, the Port argues that the lease agreement does not limit the choice of reasonable alternatives available to *the Council* or *the governor* in determining whether to approve the project.

The deciding issue here is whether WAC 197-11-070(1)(b) refers to the choice of reasonable alternatives available to the agency conducting the EIS or whether it refers to the choice of reasonable alternatives available to any governmental entity involved in a project. WAC 197-11-070(1)(b) is silent regarding this issue. It states only that until "[t]he responsible official" issues an EIS or determination of nonsignificance, an agency cannot "[l]imit *the* choice

---

[6] The Port argues that the terms of the lease agreement allow it to make changes regarding the facility depending on the results of the EIS. However, as Riverkeeper points out, the only meaningful contingency in the lease agreement is that Tesoro/Savage obtain all necessary certifications. Once certification occurs, the Port will be bound by the specific provisions in the lease agreement.

of reasonable alternatives" without particularly specifying *whose* choice cannot be limited. (Emphasis added.) Because this language arguably is subject to two reasonable interpretations, WAC 197-11-070(1)(b) is ambiguous. *Jametsky*, 179 Wn.2d at 762. We resolve ambiguity by considering other indications of legislative intent, including principles of statutory construction, legislative history, and relevant case law. *Id.* The same rules apply for regulations. *See Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 52, 239 P.3d 1095 (2010).

No legislative history or cases directly address this issue. However, as a principle of construction, we attempt construe laws relating to the same subject matter together. *Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 308-09. To the extent two such laws conflict, we give precedence to the more specific law. *Id.* at 309.

Here, WAC 197-11-070(1)(b) addresses the scope of environmental review generally. EFSLA also addresses environmental review, but is tailored specifically to energy facilities. It is designed to place all administrative responsibility for the certification of those facilities, including the necessary environmental review, on the Council, and places final decision making authority on the governor. *See Residents Opposed to Kittitas Turbines*, 165 Wn.2d at 284-85. EFSLA preempts the regulation of certification of energy facilities by any other agency, RCW 80.50.110(2), and exempts other agencies from conducting an EIS regarding the location of energy facilities. RCW 80.50.180. And it gives the Council and the governor broad discretion in considering applications for the construction of energy facilities. *Friends of the Columbia Gorge*, 178 Wn.2d at 334.

This more specific statutory scheme controls our resolution of the ambiguity in WAC 197-11-070(1)(b). We hold that the most reasonable interpretation of WAC 197-11-070(1)(b) is that when certification of energy facilities under EFSLA is involved, that regulation only

16

prohibits an agency from limiting the choice of reasonable alternatives available to the Council and the governor. Because the legislature has placed all authority regarding the certification of energy facilities with the Council and the governor, in this context whether a local agency's choices have been limited is irrelevant.

Here, the Port's lease agreement involves an energy facility. The Port's lease agreement is expressly conditioned on Tesoro/Savage obtaining EFSLA certification. And because the Council and the governor have broad discretion in considering applications for the construction of energy facilities, the terms of the lease agreement – which might be binding on the Port but not on the Council or the governor – necessarily can have no effect on the certification decision. The Council is free to deny or approve certification contingent on changing or supplementing the lease terms. Under these circumstances, whether the Port has limited *its own* choices is immaterial.

We hold that the Port's entry into the lease agreement with Tesoro/Savage did not violate WAC 197-11-070(1)(b).

C.      "SNOWBALLING" EFFECT

Riverkeeper also argues that the "snowballing" inertia generated by the lease agreement effectively forecloses full consideration of alternative possibilities and constitutes a separate violation of WAC 197-11-070(1)(b). We disagree.

Riverkeeper's argument is based on a line of cases beginning with *King County v. Washington State Boundary Review Board for King County*, 122 Wn.2d 648, 663-64, 860 P.2d 1024 (1993). In that case, the Supreme Court noted that

> [e]ven if adverse environmental effects are discovered later, the inertia generated by the initial government decisions (made without environmental impact statements) may carry the project forward regardless. When government decisions

may have such snowballing effect, decisionmakers need to be apprised of the environmental consequences *before* the project picks up momentum, not after.

122 Wn.2d at 664; *see also ILWU*, 176 Wn. App. at 522 ("The snowballing metaphor is powerful because it embodies the fundamental ideal of SEPA: to prevent government agencies from approving projects and plans before the environmental impacts of doing so are understood.").

Based on this principle, an agency violates SEPA by shaping the details of a project before completing an EIS, effectively turning administrative approval into a "yes or no" vote on that project as detailed, rather than allowing for the development and consideration of alternatives after the EIS is completed. *See Lands Council v. Wash. State Parks Recreation Comm'n*, 176 Wn. App. 787, 806-07, 309 P.3d 734 (2013). Similarly, if the initial agency action has a coercive effect on final approval such that it will likely limit the range of alternatives the approving agency will consider, this may also violate SEPA. *Cf. ILWU*, 176 Wn. App. at 524-25. For instance, this can occur where the approving agency has expended large amounts of resources to lay the groundwork for a particular project before approval and would be unable to lay that groundwork again for an alternative project. *Pub. Util. Dist. No. 1 of Clark County. v. Pollution Control Hearings Bd.*, 137 Wn. App. 150, 162, 151 P.3d 1067 (2007).

Riverkeeper's argument might have some merit if the Port was conducting the EIS and making the certification decision. Here, however, the Council is solely responsible for environmental review of the proposed energy facility. The Council likely will not be affected by whatever inertia the Port has generated for the project. Further, the Council is not bound to simply vote yes or no on the details of the project outlined in the lease agreement. The Council has authority to impose conditions on site certification not contemplated in the lease agreement in order to implement the provisions of EFSLA. RCW 80.50.100(2).

18

Riverkeeper argues that the lease agreement necessarily generates inertia because the Council will have to approve or deny the project "against the backdrop of a detailed lease that promises millions of dollars in revenue to a Washington public body." Reply Br. of Appellant at 25. However, the Council would face a similar situation even if the Port had not entered into a formal lease agreement.

Riverkeeper also notes that the lease agreement commits the Port to work diligently to pursue all necessary licenses, permits, and approvals. Again, this provision could improperly build momentum for the project if the Port was making the certification decision. But because the Port has only a nonvoting representative on the Council, *see* RCW 80.50.030(6), this provision does not limit the Council's full consideration of reasonable alternatives. And it certainly does not constrain the governor, who ultimately will decide whether to certify the project.

We hold that the Port's entry into the lease agreement with Tesoro/Savage did not violate WAC 197-11-070(1)(b) because of any "snowballing" effect.

We affirm the trial court's order granting partial summary judgment in favor of the Port.

_____
MAXA, J.

We concur:

_____
JOHANSON, C.J.

_____
SUTTON, J.

19