
FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE __MAR 1 6 2017__

CHIEF JUSTICE

This opinion was filed for record

at __8:00 am__ on __March 16, 2017__

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| COLUMBIA RIVERKEEPER, and NORTHWEST ENVIRONMENTAL DEFENSE CENTER, ) ) ) | No. 92335-3 |
| Petitioners, ) ) | |
| ) | EN BANC |
| SIERRA CLUB, ) ) | |
| Plaintiff, ) | |
| v. ) | FILED March 16, 2017 |
| ) | |
| PORT OF VANCOUVER USA; JERRY OLIVER, Port of Vancouver USA Board of Commissioners President; BRIAN WOLFE, Port of Vancouver USA Board of Commissioners Vice President and NANCY I. BAKER, Port of Vancouver USA Board of Commissioners Secretary, ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. ) ) | |

FAIRHURST, C.J.—This case involves a dispute about how the regulatory

schemes of the State Environmental Policy Act (SEPA), chapter 43.21C RCW, and

the energy facilities site locations act (EFSLA), chapter 80.50 RCW, apply to a lease agreement between respondents, the Port of Vancouver USA and its board of commissioners[1] (Port), and Tesoro Corporation and Savage Companies (hereinafter Tesoro). The lease agreement permits Tesoro to construct a petroleum based energy facility on the Port's property. The agreement remains contingent on review by, and certification from, the Energy Facility Site Evaluation Council (EFSEC), the primary decision-making authority in the field of energy facilities siting and regulation under EFSLA.

EFSLA incorporates by reference numerous regulations from SEPA, including WAC 197-11-714(3) and -070(1)(b) which preclude agencies "with jurisdiction" from taking actions that would "[l]imit the choice of reasonable alternatives" prior to the issuance of an environmental impact statement (EIS). The Port entered into the lease agreement with Tesoro prior to EFSEC's issuance of an EIS. Columbia Riverkeeper, Sierra Club, and Northwest Environmental Defense Center (hereinafter Riverkeeper) sued the Port, alleging, inter alia, that the lease agreement limited the choice of reasonable alternatives available to the Port, thereby violating SEPA.

---

[1] In addition to the Port itself, the original lawsuit named as defendants Jerry Oliver, Brian Wolfe, and Nancy Baker in their official capacities as Port of Vancouver commissioners. For ease of reference, we refer to all respondents collectively as "Port."

On summary judgment, the trial court dismissed Riverkeeper's SEPA claims in favor of the Port, holding that the contingencies contained within the lease preserved reasonable alternatives available to the Port. The Court of Appeals affirmed, concluding that the lease did not violate SEPA, although it did so by finding WAC 197-11-070 and its "reasonable alternatives" provision applied only to EFSEC and the governor, rather than the Port, and the lease did not limit *EFSEC's or the governor's* choices of "reasonable alternatives." *Columbia Riverkeeper v. Port of Vancouver USA*, 189 Wn. App. 800, 817, 357 P.3d 710 (2015), *review granted*, 185 Wn.2d 1002, 366 P.3d 1243 (2016).

In assessing the Port's compliance with SEPA, we must address the question *whose* reasonable alternatives cannot be limited? We affirm the holding of the Court of Appeals. The Port's lease with Tesoro does not violate SEPA. But we do so on the trial court's grounds. WAC 197-11-070 applies to all agencies with authority to "approve, veto, or finance all or part" of a project, which includes the Port. WAC 197-11-714(3). Because the Port's lease is subject to the condition precedent that EFSEC and the governor approve the project, inclusive of EFSLA's stated environmental priorities and EFSEC's environmental review function, and the Port retains mutual authority to approve development, construction, and operations plans for the facility, the Port did not violate WAC 197-11-070 when it entered into the lease prior to EFSEC's completion of an EIS.

3

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.    Factual background

In October 2013, the Port entered into a lease agreement with Tesoro. The agreement permits Tesoro to construct a petroleum based energy facility on the Port's property along the Columbia River that would be capable of receiving by train up to 360,000 barrels of crude oil per day. The terminal could also store up to two million barrels of crude oil or other petroleum products in above ground tanks. The facility would store and blend petroleum products before loading them for shipment by rail or by marine vessel via the Columbia River.

The lease contains a preliminary, but comprehensive, description of the facility. The Port and Tesoro must mutually approve final "specifications and designs . . . for the development, construction, and operation of the Facility" and "work diligently and in good faith" to finalize the plans. Clerk's Papers (CP) at 288-89. According to the lease, Tesoro may not occupy or develop the property until Tesoro has obtained "all necessary licenses, permits and approvals . . . for the Permitted Use," which necessarily includes EFSEC certification. CP at 288. If "any or all of the conditions precedent" noted above are not satisfied, either party may terminate the lease. CP at 281, 288.

Tesoro initiated the energy site certification process by contacting EFSEC and informing it of the facility plans. EFSEC determined that the energy facility would

4

likely have a significant adverse impact on the environment, which necessitated completion of an EIS pursuant to RCW 43.21C.030(2)(c). In its Determination of Significance Scoping Notice, EFSEC designated itself as the lead SEPA agency for preparing the EIS. CP at 170. The Determination of Significance Scoping Notice also scheduled the initial SEPA hearings to begin on October 28 and 29, 2013, approximately one week after the Port and Tesoro executed the lease. CP at 169. When this case began, the SEPA environmental analysis was ongoing.

B.    Procedural history

Riverkeeper initially brought suit against the Port on October 2, 2013, alleging that the Port had excluded the public from deliberations concerning the lease and thereby violated the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW. After the Port and Tesoro executed the lease, Riverkeeper amended the complaint to include two SEPA violations. First, Riverkeeper complained that the Port violated SEPA because it executed the lease prior to completion of the EIS. Second, Riverkeeper alleged that the Port's execution of the lease constituted an "action" under SEPA, and that the "action" limited the choice of reasonable alternatives before the completion of the EIS in violation of WAC 197-11-070. CP at 14-15. In all, the amended complaint included six claims.

The Port moved for summary judgment on all six claims. The trial court dismissed both SEPA claims, but reserved judgment on the four OPMA claims

pending additional discovery. On the first SEPA claim, the trial court reasoned that the Port did not violate SEPA because under EFSLA, the lease was exempt from the EIS requirement. On the second SEPA claim, the trial court concluded the contingencies in the lease guaranteed that it did not limit the reasonable alternatives under SEPA.[2] CP at 991. The trial court also found the SEPA claims were of "substantial public importance" and granted Riverkeeper's CR 54(b) motion for immediate appeal. CP at 1016.

In a unanimous published opinion, the Court of Appeals affirmed the trial court's summary judgment decision. *Riverkeeper*, 189 Wn. App. at 800. As to the first SEPA claim, like the trial court, the Court of Appeals found that there was no SEPA violation because EFSLA exempts the lease from the EIS requirement. *Id.* at 813. Regarding the second SEPA claim, the Court of Appeals, in departing from the trial court's grounds, ruled that when a project, like the one at issue, is subject to EFSLA, SEPA precludes only actions that limit the reasonable alternatives available to EFSEC and the governor. *Id.* at 817-18. Whether the Port's reasonable alternatives were limited by entering into the lease was, therefore, "immaterial" to the Court of Appeals. *Id.* at 818.

---

[2] Riverkeeper does not challenge the trial court's ruling inasmuch as it found that the lease did not limit EFSEC's choice of reasonable alternatives but contends only that the lease limited the *Port's* choice of reasonable alternatives.

The Court of Appeals reached this holding by first concluding the regulations under SEPA and EFSLA were in conflict and, as a result, the SEPA regulation at issue—WAC 197-11-070(1)(b)[3]—did not unambiguously provide *which* agency's alternatives cannot be limited. *Id.* at 816. It went on to resolve the ambiguity through application of the general-specific rule. The court held that EFSLA, as the more specific regime, applied. *Id.* at 817. And because EFSLA vested discretion solely within the governor and EFSEC, WAC 197-11-070(1)(b) limited only the alternatives of EFSEC and the governor. *Id.* at 816-18.

Now, only Columbia Riverkeeper and Northwest Environmental Defense Center appeal, and they do so on just the second SEPA claim—whether the Port violated WAC 197-11-070 by entering into the lease prior to EFSEC's issuance of an EIS because the lease limits the Port's reasonable alternatives. We granted the petition for review. *Riverkeeper*, 185 Wn.2d at 1002.

## II. ISSUES

A.    Do SEPA and EFSLA regulations conflict?

B.    Does WAC 197-11-070(1)(b) apply to the Port?

---

[3] WAC 197-11-070 reads in relevant part:
(1) Until the responsible official issues a final determination of nonsignificance or final environmental impact statement, no action concerning the proposal shall be taken by a governmental agency that would:
. . . .
(b) Limit the choice of reasonable alternatives.

7

C.    Does the conditions precedent clause and the Port's retained mutual approval authority within the lease satisfy the Port's obligation under the regulation's "reasonable alternatives" provision?

### III. ANALYSIS

"We review the propriety of summary judgment rulings de novo, viewing the facts in the light most favorable to the nonmoving party. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Save Our Scenic Area v. Skamania County*, 183 Wn.2d 455, 463, 352 P.3d 177 (2015). Neither party contends a genuine issue of material fact remains. At issue is the interpretation of WAC 197-11-070(1)(b) and its application to the lease between the Port and Tesoro.

Statutory and regulatory interpretation is a question of law that we also review de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761-62, 317 P.3d 1003 (2014) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)); *City of Seattle v. Burlington N. R.R. Co.*, 145 Wn.2d 661, 665, 41 P.3d 1169 (2002). We interpret administrative regulations using rules of statutory construction. *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 51, 239 P.3d 1095 (2010) (citing *City of Seattle v. Allison*, 148 Wn.2d 75, 81, 59 P.3d 85 (2002)). The purpose of our inquiry is to determine legislative intent and interpret the statutory provisions in such a way so as to carry out that intent. *Jametsky*, 179 Wn.2d at 762. If possible,

we give effect to the plain meaning of the statute as a pronouncement of legislative intent. *Id.* When attempting to ascertain a statute's plain meaning, we may consider the "context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Id.* (quoting *Campbell & Gwinn*, 146 Wn.2d at 11).

If a statute is subject to more than one reasonable interpretation, we consider it ambiguous. *Id.* (citing *City of Seattle v. Winebrenner*, 167 Wn.2d 451, 456, 219 P.3d 686 (2009)). After determining that a statute is ambiguous, "we 'may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent.'" *Id.* (quoting *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007)).

A.    SEPA and EFSLA regulations do not conflict

    1.    SEPA provides decision makers with the environmental impacts of proposed actions

The legislature enacted SEPA in 1971 to inject environmental consciousness into governmental decision-making. *See* WAC 197-11-714(1). SEPA was intended

> (1) [t]o declare a state policy which will encourage productive and enjoyable harmony between humankind and the environment; (2) to promote efforts which will prevent or eliminate damage to the environment and biosphere; (3) and [to] stimulate the health and welfare of human beings; and (4) to enrich the understanding of the ecological systems and natural resources important to the state and nation.

RCW 43.21C.010 (alteration in original). SEPA expressly acknowledges that "each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." RCW 43.21C.020(3). SEPA's primary focus is on the decision-making process. 24 WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 17.1, at 192 & n.8 (2d ed. 2007) (citing *Save Our Rural Env't v. Snohomish County*, 99 Wn.2d 363, 662 P.2d 816 (1983)). As such, SEPA seeks to ensure that environmental impacts are considered and that decisions to proceed, even those completed with the knowledge of likely adverse environmental impacts, be "rational and well-documented." *Id.* at 192.

SEPA requires that agencies complete an EIS prior to undertaking "major actions significantly affecting the quality of the environment." RCW 43.21C.030(2)(c). The EIS is to be completed by the "responsible official"[4] and must include

> (i) the environmental impact of the proposed action;
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;
> (iii) alternatives to the proposed action;
> (iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and

---

[4] "'Responsible official' means that officer or officers, committee, department, or section of the lead agency designated by agency SEPA procedures to undertake its procedural responsibilities as lead agency (WAC 197-11-910)." WAC 197-11-788.

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

Often, environmental review requires input from many different agencies. *See* WAC 197-11-420 (contemplating input from multiple sources). To prevent piecemeal decision-making and to ensure continuity in environmental review, SEPA regulations designate a lead agency to complete each EIS. WAC 197-11-050; *see also Int'l Longshore & Warehouse Union, Local 19 v. City of Seattle*, 176 Wn. App. 512, 519-20, 309 P.3d 654 (2013) (citing *State v. Grays Harbor County*, 122 Wn.2d 244, 250-51, 857 P.2d 1039 (1993)). According to the SEPA regulations, "[t]he lead agency shall be the agency with main responsibility for complying with SEPA's procedural requirements and shall be the only agency responsible for . . . (b) [p]reparation and content of [EISs]." WAC 197-11-050(2). When the governmental action concerns energy facilities requiring EFSLA certification, the SEPA regulations designate EFSEC as the lead SEPA agency. *See* WAC 197-11-938(1).

SEPA also prohibits agency action that would adversely affect the environment until the lead agency's EIS can fully inform that action. Specifically, WAC 197-11-070(1) does so by providing that "[u]ntil the responsible official issues a final determination of nonsignificance or final [EIS], no action concerning the proposal shall be taken by a governmental agency that would . . . (b) [l]imit the

choice of reasonable alternatives." Interpretation of this provision is at issue in this case.

2.     EFSLA seeks to minimize the environmental impact of energy projects

Our legislature promulgated EFSLA to provide "an expedited and centralized process for reviewing potential energy facility sites in Washington State." *Friends of Columbia Gorge, Inc. v. State Energy Facility Site Evaluation Council*, 178 Wn.2d 320, 328, 310 P.3d 780 (2013). With its enactment of EFSLA, the legislature sought to balance environmental concerns with the pressing need for increased energy facilities. RCW 80.50.010. As part of this balance, the legislature meant "[t]o avoid costly duplication in the siting process and ensure that decisions are made timely and without unnecessary delay," which it accomplished by vesting EFSEC with exclusive jurisdiction over the certification, location, construction, and operation of energy facilities meeting certain size requirements.[5] RCW 80.50.010(5), .110(2).

Pursuant to statutory directive, EFSEC must include a chair appointed by the governor with the advice and consent of the senate; representatives from the

---

[5] Tesoro's proposed energy facility would be capable of receiving 500,000 barrels of crude oil per day. EFSLA grants EFSEC exclusive jurisdiction over any energy facility "which will have the capacity to receive more than an average of fifty thousand barrels per day of crude or refined petroleum or liquefied petroleum gas which has been or will be transported over marine waters." RCW 80.50.020(12)(d). Neither party disputes that the proposed facility is subject to EFSLA or that an EIS must be completed by EFSEC prior to the governor's final approval.

12

Department of Ecology, the Department of Fish and Wildlife, the Department of Commerce, the Utilities and Transportation Commission, and the Department of Natural Resources; a representative from the county, city, or port where the energy facility is to be sited; and an assistant attorney general representing the interests of the environment. RCW 80.50.030.

EFSEC's review process begins once it receives a proponent's application. *Friends of Columbia Gorge*, 178 Wn.2d at 328-29. EFSEC conducts informational public hearings in the county of the proposed siting and, following these hearings, conducts a hearing to ensure the proposal's compliance with land use and zoning requirements. *Id.* Consistent with the Administrative Procedure Act, chapter 34.05 RCW, EFSEC conducts a hearing to allow parties to challenge its initial determinations and may conduct additional hearings as necessary. *Id.* (citing RCW 80.50.090). Once it has completed these steps, EFSEC submits its recommendation to the governor, and if EFSEC is recommending approval, it includes a draft certification agreement with its recommendation. *Id.* The governor then determines whether to approve the application and execute a site certification agreement, reject the application, or require EFSEC to reconsider aspects of the application. *Id.* The governor's decision to reject the application is final, unless there is new information or conditions change, warranting a new submission. *Id.*

13

3.     SEPA and EFSLA overlap rather than conflict

SEPA and EFSLA reflect the legislature's desire to carefully balance developmental and environmental concerns. SEPA, recognizing that government activity will inevitably impact the environment, does not "dictate a particular substantive result." *Save our Rural Env't*, 99 Wn.2d at 371. Instead, SEPA's EIS mandate simply ensures that "environmental matters can be given proper consideration during decision making." *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 273, 552 P.2d 674 (1976). Similarly, the legislature enacted EFSLA to "balance the increasing demands for energy facility location and operation in conjunction with the broad interests of the public." RCW 80.50.010. Similarly, the policy of EFSLA is not only to expedite and centralize the review process for energy facility projects, but to promote facilities that "will produce minimal adverse effects on the environment." *Id.*

SEPA broadly mandates environmentally sensitive decision-making; EFSLA focuses on the "discrete and specific function" of certifying new energy facilities. RCW 43.21C.030; *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 309-10, 197 P.3d 1153 (2008). Overlapping statutes do not necessarily conflict. This is particularly true when SEPA is involved. This court has previously recognized the legislature intended that SEPA *complement* other legal frameworks. *Dept. of Nat. Res. v. Thurston County*, 92

14

Wn.2d 656, 664, 601 P.2d 494 (1979) ("As we have repeatedly pointed out, SEPA is an overlay of law which supplements existing statutory authority."); *Save our Rural Env't*, 99 Wn.2d at 371 ("SEPA is essentially a procedural statute to ensure that environmental impacts and alternatives are properly considered by the decision makers" and "was not designed to usurp local decisionmaking"). In construing overlapping legislation, courts must read provisions that govern the same subject matter in pari materia. *Residents*, 165 Wn.2d at 308. Such statutory schemes must, when possible, be construed harmoniously. *Id.*

Further, EFSEC's regulations demonstrate that, like SEPA, EFSLA seeks to minimize the environmental impacts of development. WAC 463-47-110(1)(a) declares that "[t]he overriding policy of [EFSEC] is to avoid or mitigate adverse environmental impacts which may result from [EFSEC's] decisions." EFSEC regulations further recognize that "each person has a fundamental and inalienable right to a healthful environment," and instruct EFSEC to ensure that environmental values "will be given appropriate consideration in decision making." WAC 463-47-110(1)(c), (d). The fact that EFSEC conducts environmental review under SEPA and has explicitly adopted SEPA into its own regulations further supports the compatibility of the statutory regimes. WAC 463-14-080(3); WAC 463-47-020, -030. EFSEC itself serves as the SEPA lead agency responsible for completing the EIS. WAC 463-47-090(1). Nor does EFSLA preempt or otherwise eliminate SEPA's

15

requirements for another "'[a]gency with jurisdiction,'" which is an agency with "authority to approve, veto, or finance all or part" of a project, to comply with SEPA. WAC 197-11-070, -714(3). EFSEC simply serves as the lead agency for purposes of EIS preparation.

**B.     WAC 197-11-070(1)(b) unambiguously applies to the Port**

The Court of Appeals found, based on its perception that SEPA and EFSLA regulations were in conflict, that WAC 197-11-070(1)(b) was ambiguous and, based on that ambiguity, the regulation could be interpreted as *not* applying to the Port. *Riverkeeper*, 189 Wn. App. at 816-18. We reverse this holding. There is no ambiguity in the regulation, and on its face, it applies to the Port.

The regulation applies to any (1) "governmental agency" (2) capable of taking "action" (3) "[l]imit[ing] the choice of reasonable alternatives." WAC 197-11-070(1)(b). An "agency" is defined as "any state or local governmental body . . . authorized to . . . take the actions stated in WAC 197-11-704."[6] WAC 197-11-714(1). The Port is an agency for these purposes. Further, neither party disputes that by entering into the lease agreement with Tesoro, the Port took action. A "reasonable alternative"

---

[6] WAC 197-11-704(1)(a) defines "actions" as "[n]ew and continuing activities (including projects and programs) entirely or partly financed, assisted, conducted, regulated, licensed, or approved by agencies."

16

means an action that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation. Reasonable alternatives may be those over which an *agency with jurisdiction has authority* to control impacts, either directly, or indirectly through requirement of mitigation measures.

WAC 197-11-786 (emphasis added). If the purpose of the regulation is to preserve reasonable alternatives, then it must apply to entities *with power* over those alternatives, or in other words, an "'[a]gency with jurisdiction.'" WAC 197-11-714(3). By this definition, the Port is an agency with jurisdiction. WAC 197-11-786.

The legislature empowered the Port to determine whether, and under what terms, to lease public property under its control. *See* RCW 53.08.080 ("A [Port] may lease all lands . . . owned and controlled by it, for such purposes and upon such terms as the port commission deems proper."). This statutory authority grants the Port de facto approval and veto power over any proposal to be sited on the Port's land. These are the exact qualities of an agency with jurisdiction. Further, all of the SEPA regulations described above are incorporated by reference into EFSLA regulations. WAC 463-47-020. Therefore, WAC 197-11-070(1)(b) unambiguously applies to the Port.

In holding otherwise, the Court of Appeals relies on *Residents*, which involved a conflict between EFSLA and the Growth Management Act (GMA), chapter 36.70A RCW. 165 Wn.2d at 284-85. At issue in that case were dueling

17

preemption clauses: the GMA instructs state agencies to comply with "local comprehensive plans and development regulations," RCW 36.70A.103, while EFSLA grants EFSEC the power to supersede local zoning and licensing requirements, RCW 80.50.110(2). As a result, this court read EFSLA as a "specific exception to the general goals and procedures of the GMA" and affirmed EFSEC's preemption authority. *Residents*, 165 Wn.2d at 310.

The conflict between EFSLA and the GMA that this court addressed in *Residents* is not present here. As already discussed, SEPA and EFSLA are both designed to advance similar goals—minimizing environmental harm. *See ASARCO, Inc. v. Air Quality Coal.*, 92 Wn.2d 685, 710-11, 601 P.2d 501 (1979) (holding there is no conflict between SEPA and the Washington Clean Air Act because both statutes are designed to prevent ecological damage and reconciling the statutes to further "the strong policy behind both [schemes]"). The legislature specifically intended SEPA to supplement, rather than replace, Washington's existing laws. RCW 43.21C.060 ("The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of all branches of government of this state. . . ."). Furthermore, *Residents* was premised on conflicting preemption provisions, which is not the case here—EFSLA has specifically *adopted* SEPA into its own regulations. WAC 463-47-020.

18

The purpose of EFSEC is to oversee site certification procedures, ensure compliance with SEPA's environmental review requirements, and make a certification recommendation to the governor. *Residents*, 165 Wn.2d at 285. As the SEPA lead agency, EFSEC is also responsible for preparing the EIS. These combined responsibilities ensure EFSEC evaluates all reasonable alternatives to the proposed energy facility. WAC 463-47-090(1); WAC 197-11-440. The regulation at issue in this case, WAC 197-11-070(1)(b), prevents EFSEC or other agencies with jurisdiction from eliminating alternate designs before they can be properly evaluated.

Further, EFSLA's preemption clause, by its own terms, does not apply to the statutory source of the Port's SEPA status. EFSLA preempts only regulation and certification matters relating to energy facility sites, such as local land use rules. RCW 80.50.110. This serves to reduce construction delay; site certification, once obtained, is the only license necessary to construct and operate the project. RCW 80.50.120(3). By contrast, the Port's SEPA status is derived from its authority to lease public lands under its control. *See* RCW 53.08.080. The Port's leasing power is distinguishable from the land use regulations and zoning rules that EFSLA preempts. *See Residents*, 165 Wn.2d at 308. The Port's power to lease is outside the scope of EFSLA and therefore should not be preempted by it. To hold otherwise invites an absurd result—armed with an EFSLA certification, a project applicant

19

could build and operate an energy facility on the Port's land without ever consulting the Port or obtaining its consent.

The logic of this analysis is straightforward—examine the practical effect of applying WAC 197-11-070(1)(b) to the Port. If preventing the Port from limiting its own reasonable alternatives somehow interferes with EFSEC's ability to meet its SEPA obligations under SEPA as the lead agency, or its EFSLA obligations as the agency making a recommendation to the governor, it would be reasonable to find that WAC 197-11-070(1)(b) should not apply to the Port. But no such interference is apparent. To the extent that EFSLA divests the Port of its role under SEPA, it does so only as it relates to EFSEC's review and resulting recommendation to the governor regarding site certification. EFSLA's delegation of power to EFSEC does not exempt the Port from the entirety of SEPA. Similarly, it does not empower the Port to make environmentally significant decisions without the benefit of environmental review.

EFSEC's designation as lead agency for SEPA environmental review purposes does not liberate any other governmental body from complying with SEPA's fundamental mandate to make environmentally informed decisions. While EFSEC and the governor unquestionably have broad discretion over the energy facility siting process, *Friends of Columbia Gorge*, 178 Wn.2d at 334, the Port alone has plenary authority to determine whether to lease public property under its control,

RCW 53.08.080. This decision is independently subject to SEPA and must await the lead agency's analysis of environmental impacts and reasonable alternatives. WAC 197-11-070(1)(b).

C.    The conditions precedent clause and the mutual approval provision in the Tesoro lease satisfies the Port's obligations under WAC 197-11-070(1)(b)

The Port must ensure it does not limit its choice of "reasonable alternatives" before EFSEC's environmental review is complete. WAC 197-11-070(1)(b). But reasonable alternatives, for this purpose, are limited. Only those actions that could "feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation" are "[r]easonable alternatives" that the Port, EFSEC, and the governor cannot limit until the EIS is issued. WAC 197-11-786. The Port satisfies this requirement through a combination of the condition precedent and its retained mutual approval authority contained within its lease with Tesoro.

The lease precludes occupancy or development of the property until the following condition precedent has been satisfied: Tesoro has obtained "all necessary licenses, permits and approvals . . . for the Permitted Use," which necessarily includes EFSEC certification. CP at 288. If the condition precedent is not satisfied, either party may terminate the lease. The Port also retains the authority, in conjunction with Tesoro, to "approve . . . construction plans, specifications and

21

designs . . . for the development, construction, and operation of the Facility." CP at 288-89.

Riverkeeper asserts the condition precedent does not allow the Port to change lease terms based solely on results of the EIS, nor does the reservation of mutual authority to approve plans, specifications, and designs satisfy the Port's obligation under WAC 197-11-070(1)(b). Riverkeeper further argues that the lease's description of permitted uses limits consideration of alternative designs. Finally, Riverkeeper cautions us that "'snowballing'" inertia generated by the lease agreement effectively forecloses full consideration of the Port's alternative possibilities. *Riverkeeper*, 189 Wn. App. at 818.

But as the Court of Appeals discussed, the governor will ultimately decide whether to certify the project based on EFSEC's recommendation. *Id.* at 820. And EFSEC's recommendation, informed by the results of the EIS, must be consistent with "[t]he overriding policy of [EFSEC] . . . to avoid or mitigate adverse environmental impacts" and consistent with the principle that "each person has a fundamental and inalienable right to a healthful environment." WAC 463-47-110(1)(a), (c). In addition, both EFSEC and the governor remain subject to the reasonable alternatives requirement of WAC 197-11-090(1)(b) themselves. Therefore, they must consider whether the proposed certification is the most likely

alternative to feasibly attain or approximate the Port's lease objectives at the lowest environmental cost or level of environmental degradation. WAC 197-11-786.

If EFSEC or the governor believe that the project does not meet EFSEC's overriding goal of avoiding or mitigating adverse impacts, as informed by the reasonable alternative analysis contained within the resulting EIS pursuant to WAC 197-11-440(5), they may withhold approval outright, or grant approval contingent on changes to the lease. Similarly, the Port's retained mutual approval authority to modify the development, construction, and operational plans of the facility ensures the Port retains broad authority to make adjustments as the project proceeds.

The condition precedent contained within the lease, coupled with EFSEC's recommendation based on its environmental priorities, the governor's discretion to certify the project, and the Port's reserved mutual approval authority ensures "'[r]easonable alternative[s]'" for the Port, as defined in WAC 197-11-786, are preserved. The dissent acknowledges the sweeping effect of the condition precedent, noting that it goes so far as to "allow[] either party to back out of the project in the event that EFSLA certification is refused," dissent at 10, yet it still finds the provision insufficient to ensure reasonable alternatives remain available to the Port. We disagree. The lease language plainly preserves the Port's ability to shape the final project in response to environmental review, for example by adopting

23

additional mitigation measures, heightened insurance requirements, or modifying project specifications. This preserves reasonable alternatives.

Further, as the Court of Appeals notes, while inertia may be a concern if the project decision was solely at the discretion of the Port, the lease is contingent on EFSEC's, and ultimately the governor's, acquiescence, neither of whom are subject to the inertia articulated by Riverkeeper for the Port. The dissent similarly raises the inertia argument, but the cases it cites are inapposite. Unlike the lease agreement at issue here, the cases the dissent cites address the adequacy of *completed* environmental review. *See King County v. Wash. State Boundary Review Bd.*, 122 Wn.2d 648, 664, 860 P.2d 1024 (1993) (challenging a determination of nonsignificance); *Barrie v. Kitsap County*, 93 Wn.2d 843, 857, 613 P.2d 1148 (1980) (challenging the alternatives included in an EIS); *Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 41, 873 P.2d 26 (1994) (same). We have not yet reached that point here. If Riverkeeper finds the resulting EIS inadequate, for similar reasons as in the cases cited by the dissent, it may wish to consider challenging the adequacy of the EIS. But the cases cited by the dissent do not provide us a basis to invalidate the current lease agreement, irrespective of the results of environmental review.

Finally, Riverkeeper's permitted uses argument is unpersuasive. The lease requires the consent of the Port for any use outside of those permitted by the lease. CP at 296. The provision does not limit the Port's discretion.

## IV. CONCLUSION

We hold that regulations under SEPA and EFSLA do not conflict. As a result, WAC 197-11-070(1)(b) unambiguously applies to the Port. In addition, the conditions precedent and mutual approval authority provisions in the Port's lease agreement with Tesoro, when coupled with EFSEC's certification criteria and the governor's discretion, ensure the lease does not constrain the reasonable alternatives available to the Port. Therefore, the Port's execution of the lease did not violate SEPA.

We affirm the Court of Appeals, but do so on the trial court's grounds.

Fairhurst, C.J.

WE CONCUR:

Madsen, J.

Wiggins, J.

González, J.

*Columbia Riverkeeper v. Port of Vancouver USA, et al.*

No. 92335-3

STEPHENS, J. (dissenting)—We agree with the majority that WAC 197-11-070(1)(b) is unambiguous and clearly applies to the Port of Vancouver. By virtue of its leasing authority, the Port is an "agency with jurisdiction," WAC 197-11-786, and required to comply with WAC 197-11-070(1)(b). We also agree that the State Environmental Policy Act (SEPA), chapter 43.21C RCW, and the energy facilities site locations act (EFSLA), chapter 80.50 RCW, are not in conflict. Because SEPA and EFSLA are overlapping but complementary statutory schemes, the Port, the Energy Facility Site Evaluation Council (EFSEC), and the governor are all subject to both EFSLA's specific requirements and SEPA's broader mandates. EFSLA neither generally preempts SEPA nor "empower[s] the Port to make environmentally significant decisions without the benefit of environmental review." Majority at 20.

Having acknowledged these truths, however, the majority's conclusion that the Port did not violate SEPA is untenable. SEPA mandates that governmental agencies be informed of the likely environmental consequences of their decisions before making them. WAC 197-11-070(1)(b) implements this mandate by prohibiting agencies from restricting reasonable alternatives to a proposal before environmental review is complete. Here, the Port signed a binding commercial lease, committing itself to the version of the project articulated therein. This necessarily restricted reasonable alternatives. Neither the lease negotiations nor the Port's decision to sign benefitted from the necessary environmental review. Because SEPA requires more, we respectfully dissent.

ANALYSIS

A. The Port Violated SEPA By Limiting Reasonable Alternatives to the Tesoro Project prior to Environmental Review

The legislature enacted SEPA with the clear aim of injecting environmental awareness into all levels of governmental decision making. *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 63-64, 578 P.2d 1309 (1978). To achieve this goal, SEPA requires government agencies to study the likely environmental impacts of their proposals *before* taking action. RCW 43.21C.030. SEPA's primary tool for implementing this mandate is the environmental impact statement (EIS): for every action likely to "significantly affect[] the quality of the environment," SEPA requires

-2-

the designated lead agency to prepare a "detailed statement"[1] assessing the proposal's foreseeable impacts. *Id.* at (2)(c). The purpose of the EIS is to ensure that a "full consideration of environmental impacts" informs governmental decision making. *Polygon Corp.,* 90 Wn.2d at 63; *King County. v. Wash. State Boundary Review Bd.,* 122 Wn.2d 648, 659, 860 P.2d 1024 (1993). In short, the EIS is the "vector" by which SEPA integrates its policies and requirements into the thoughts and actions of state and local agencies. *See* RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT § 14.01, at 14-6 (2016).

If the EIS is to actually inform the decision-making process—rather than rubber-stamping a predetermined outcome—it must be available before key decisions are made. The EIS "must be prepared early enough to inform and guide decisionmakers rather than rationalize or justify decisions already made." *Id.* at 14-6 to 14-7 & n.34 (citing *Barrie v. Kitsap County,* 93 Wn.2d 843, 613 P.2d 1148 (1980)). This court has cautioned against delaying EIS preparation to the point where proponent agencies become internally committed: "[T]he risk of postponing environmental review is 'a dangerous incrementalism where the obligation to decide is postponed successively while project momentum builds.'" *King County,* 122

---

[1] An EIS is a "detailed statement" describing the environmental impact, adverse environmental effects, and any mitigation measures or alternatives relevant to a proposed action. RCW 43.21C.030(2)(c); WAC 197-11-440.

Wn.2d at 664 (quoting William H. Rodgers, *The Washington Environmental Policy Act*, 60 WASH. L. REV. 33, 54 (1984)). When an agency commits significant time and resources to detailed project planning, the action "can 'snowball' and acquire virtually unstoppable administrative inertia." *Id.* To avoid this, "decisionmakers need to be apprised of the environmental consequences *before* the project picks up momentum, not after." *Id.*[2]

The scope of review is equally crucial to implementing SEPA's mandate. In order to effectively inform decision-making, it is not enough for an EIS to be timely—it must also be useful. The EIS should educate decision-makers on the likely environmental consequences of the action as well as highlight "reasonable alternatives" to the proposal. WAC 197-11-440 (EIS contents); WAC 197-11-786 (defining "reasonable alternatives"). It is difficult to overstate the importance of reasonable alternatives to achieving SEPA's underlying policy goals, which seek to balance the needs of the environment with the inevitability of development. *See* RCW 43.21C.010(1)-(4).[3] By explaining how the action agency can achieve its

---

[2] The importance of early review is reflected in SEPA's rules. *See, e.g.*, WAC 197-11-400(4), -402(8)-(10), -406. This is to "emphasize that the purpose of the EIS is more than mere disclosure, rationalization or justification; it is to be used by agency officials in making decisions on proposed actions." SETTLE, *supra*, at 14-6.

[3] The legislature enacted SEPA to encourage "harmony between humankind and the environment" by pursuing projects that will "stimulate the health and welfare of human beings" while also "promot[ing] efforts which will prevent or eliminate damage to the environment." RCW 43.21C.010(1)-(3).

project objectives at a lower environmental cost, the discussion of reasonable alternatives in the EIS carries out SEPA's core policy in the form of practical advice.

Understood in this context, the importance of the regulation designed to preserve reasonable alternatives becomes clear. WAC 197-11-070(1)(b) prohibits any "governmental agency" from taking "action" that would "[l]imit the choice of reasonable alternatives." *Id.* The regulation ensures timely environmental review by restricting the number of decisions that can be made pre-EIS, effectively "freezing" proposal development early in the project life cycle. WAC 197-11-070(1)(b) also supports EIS quality and utility. Without this rule, EFSEC could choose to evaluate only its preferred alternatives and ignore the rest. It might also discard certain alternatives as "unreasonable" if they conflicted with decisions or commitments that have already been made. The resulting analysis would be less reliable and correspondingly less useful. *See, e.g., Weyerhaeuser v. Pierce County*, 124 Wn.2d 26, 41, 873 P.2d 498 (1994) (finding an EIS inadequate for impermissibly excluding certain reasonable alternatives). If a nonlead agency like the Port could preemptively restrict the alternatives available for evaluation, the effect—and result—would be the same.

The majority, without further analysis, cites to the definition in the SEPA rules: "reasonable alternatives" are "actions that could 'feasibly attain or

approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation.'" Majority at 21 (quoting WAC 197-11-786). This is accurate, but unenlightening. It is important to understand exactly what is at stake in the consideration of reasonable alternatives. Concrete examples provided in Department of Ecology (DOE) publications and this court's cases are helpful. DOE guidance explains that "[p]roject alternatives might include design alternatives, location options on the site, different operational procedures, various methods of reclamation [and] closure options, etc. For public projects, alternative project sites should also be evaluated." DEPARTMENT OF ECOLOGY, SEPA HANDBOOK § 3.3.2, at 54 (2003). Similarly, in *Weyerhaeuser* this court explained that

> the alternatives section of the EIS must describe the objectives, proponents and principal features of reasonable alternatives, including the proposed action with any mitigation measures . . . [and] devote sufficiently detailed analysis to each alternative so as to permit a comparison of the alternatives.

124 Wn.2d at 41 (further noting that "[t]here must be a reasonably detailed analysis of a reasonable number and range of alternatives"); *see also* WAC 197-11-792(2)(b)(i)(iii) (clarifying that a "[n]o action" alternative and mitigation measures not discussed in the original proposal should also be included in the analysis).

These examples illustrate what WAC 197-11-070(1)(b) requires. In practical terms, the whole series of project variables—including design specifications, site location, land reclamation and closure requirements, mitigation measures, etc.—

must *remain* variables until the EIS is complete. Before that time, if a project agency acts to eliminate one or more reasonable alternatives in any of these categories, it violates SEPA.

*(1) The Port Limited Reasonable Alternatives to the Tesoro Project by Signing a Binding Commercial Lease*

The terms of the commercial lease signed by the Port and its business partners, the Tesoro Corporation and Savage Company (collectively Tesoro), concretize many of the project variables discussed above. With respect to project design, the "Permitted Use" section specifies project elements and the function of each: a "Rail/Rack Area" for the loading, unloading, and transfer of petroleum products (and associated maintenance); "Support Areas" for administrative support; a "Storage Area," including six 380,000-barrel-capacity tanks and a pipeline connecting to other areas, for storage and blending of petroleum products; and a "Marine Terminal Area" transferring petroleum products to and from marine vessels. Clerk's Papers (CP) at 284, 380 (formatting omitted). In terms of location, the lease gives a nod to preserving on-site location alternatives, *id.* at 280, yet unquestionably allows only one location for the project itself: the Port of Vancouver. *Id.* at 351-62 (legal description of leased area). In the reclamation and closure category, the lease places Tesoro in charge of conducting an "Exit Contamination Assessment" prior to the expiration of the lease. *Id.* at 307-08 (formatting omitted). The lease specifies the

assessment's timing, the categories of environmental harm to be assessed, and the criteria by which Tesoro will be held responsible for remediation or cleanup. *Id.* Finally, with respect to mitigation, the lease eliminates the possibility that Tesoro might be required to reduce long-term environmental impact by addressing any preexisting environmental conditions during its end-of-lease cleanup. *Id.* The lease also specifies a relatively modest amount of pollution insurance Tesoro must carry ($25 million), effectively establishing the "mitigation budget" in the event of natural resources damages from spills, contamination, or explosion. *Id.* at 285, 316.

These key contract terms limit reasonable alternatives to the Tesoro project. By signing the lease, the Port committed itself to "work diligently and in good faith" to bring about the version of the project articulated therein. *Id.* at 288. Where the lease provides a framework, any reasonable alternatives inconsistent with that framework are precluded. *See, e.g., id.* at 284 ("Permitted Use," describing project design elements (formatting omitted)). Where the lease is most specific—specifying the number and capacity of storage tanks, requiring Tesoro to carry exactly $25 million in pollution insurance, etc.—it eliminates *all* relevant reasonable alternatives.

SEPA should not be misinterpreted as forbidding project agencies from articulating any project details prior to environmental review.[4] In fact, SEPA rules specifically invite agencies to "develop[] plans or designs . . . [as] necessary to develop an application for a proposal." WAC 197-11-070(4). However, a SEPA project proposal is neither binding nor final. The Port's actions in this case violated WAC 197-11-070(1)(b) by committing to project details in a lease that, as the Court of Appeals correctly recognized, would bind the Port upon certification. *See Columbia Riverkeeper v. Port of Vancouver USA*, 189 Wn. App. 800, 815, 357 P.3d 710 (2015), *review granted*, 185 Wn.2d 1002, 366 P.3d 1243 (2016). The lease is also final: the Port did not reserve any rights to renegotiate the lease's terms. Future design, construction, and operational choices must be "mutually approve[d]" by both parties. CP at 288-89. As a result, the lease grants Tesoro de facto veto power over final design. Any future modifications to the project, including the pursuit of reasonable alternatives, can proceed only with Tesoro's permission. *Id.*

---

[4] We recognize that as a practical matter, the Port and Tesoro (indeed, parties to any major project) will want to reach certain understandings prior to completion of the EIS. Rather than signing binding contracts that limit reasonable alternatives, their option consistent with SEPA is to enter into a memorandum of understanding (MOU) or similar arrangement. In *International Longshore & Warehouse Union, Local 19 v. City of Seattle*, the court held that an MOU is not an "action" under SEPA and does not limit reasonable alternatives. 176 Wn. App. 512, 523, 309 P.3d 654 (2013) (explaining that Seattle's MOU with a private investor did "not limit or control future decisions the city and county may be called on to make").

The majority suggests that the conditions precedent clause in the lease provides a sufficient safeguard against violations of WAC 197-11-070(1)(b). Majority at 22. As a precondition to Tesoro occupying the property, the lease requires Tesoro (with the Port's help) to obtain "all necessary licenses, permits and approvals," CP at 288, including EFSEC certification. Failing this, either party may terminate the lease. *Id.* at 281, 288. The majority concludes, without explanation, that this clause "satisfies" the Port's obligation to avoid restricting reasonable alternatives. Majority at 21. We disagree. On its face, this language is irrelevant to the limitation of reasonable alternatives. The clause does not allow for renegotiation of the contract's detailed terms during or after the contingency period.[5] It merely allows either party to back out of the project in the event that EFSLA certification is refused (at which point the project could not proceed anyway). Furthermore, the purpose of this contractual language is not to assure SEPA compliance. Preapproval requirements are fairly common in business leases and typically serve as an "escape clause" to free each party from its obligations in the event of contract frustration. *See, e.g.*, 2 ALVIN L. ARNOLD & MYRON KOVE, MODERN REAL ESTATE PRACTICE

---

[5] To the extent that the majority implies that any restriction of alternatives in the lease remains "dormant" until EFSEC certifies the project, this too is incorrect. Majority at 22-23. The lease specifies that certain terms have legal force during the contingency period. CP at 288 (noting that once signed, the lease obliges Tesoro to pay a "Contingency Period Fee" and charges both parties to "work diligently and in good faith to pursue all necessary licenses, permits and approvals").

FORMS AND COMMENTARY § 22:11 (2007);[6] *see also Weyerhaeuser Real Estate Co. v. Stoneway Concrete, Inc.*, 96 Wn.2d 558, 637 P.2d 647 (1981) (contract frustration of a mining lease containing similar language). This boilerplate contract provision provides too slim a reed on which to hang meaningful SEPA compliance.

> (2) *The Port's Action Conflicts with SEPA's Fundamental Mandate of Environmentally Informed Decision-Making*

The majority argues that the other actors involved in this case, EFSEC and the governor, can ultimately ensure SEPA compliance. Majority at 22-23. The majority reasons that because EFSEC and the governor are independently subject to SEPA and are required to consider reasonable alternatives, this "ensures "'[r]easonable alternative[s]'" for the Port." *Id.* at 23 (alterations in original) (quoting WAC 197-11-786). This is illogical. As Riverkeeper points out, the fact that EFSEC will conduct a SEPA review before recommending whether to certify the Tesoro project "has no bearing on whether the Port violated its SEPA obligations by taking an action that limits the Port's alternatives before the EIS issued." Suppl. Br. of Pls.-Pet'rs at 17. Each responsible agency must meet its own obligations. Furthermore, the majority's implicit conclusion—that the Port's actions limiting reasonable

---

[6] "The Contract shall be closed . . . after all licenses and governmental approvals have been obtained from all required authorities . . . . [I]n the event that the closing does not take place within *[number of months]* . . . then the Seller or the Buyer shall have the option to terminate this Contract." (Third alteration in original.)

alternatives were harmless so long as the final decision to certify or reject the proposal complies with SEPA—fundamentally misinterprets the statutory scheme. SEPA is not solely concerned with the final decision to approve or reject a proposal. Instead, its core mandate is triggered earlier in the project life cycle.

SEPA requires government agencies to consider environmental impacts throughout "the decisionmaking *process*." *Leschi Improvement Council v. Wash. State Highway Comm'n*, 84 Wn.2d 271, 300, 525 P.2d 774 (1974) (emphasis added). This is why SEPA projects are not presented fully fledged, awaiting only an up or down vote; the design of the project itself should benefit from information revealed by environmental review.[7] The idea that lessons learned from environmental review should inform project planning is foundational to this court's case law requiring timely SEPA review. *See, e.g., King County*, 122 Wn.2d at 664. Without it, the lead agency's mandate to evaluate and recommend the least harmful reasonable alternative would be pointless.[8]

---

[7] As the Court of Appeals observed, it is a violation of SEPA to "shap[e] the details of a project before completing an EIS, effectively turning administrative approval into a 'yes or no' vote on that project as detailed." *Columbia Riverkeeper*, 189 Wn. App. at 818-19 (citing *Lands Council v. Wash. State Parks & Recreation Comm'n*, 176 Wn. App. 787, 806-07, 309 P.3d 734 (2013)).

[8] The majority mischaracterizes SEPA's mandate for early environmental review as solely concerned with combatting institutional "inertia." Majority at 24. This devalues its critical importance. Timely review is essential to ensuring that decision-makers are properly informed *before* they make important project design decisions. EFSEC's forthcoming EIS will do nothing to inform the Port about decisions it has already made.

In this case, it is undisputed that the Port negotiated and signed the lease with Tesoro without the benefit of environmental review. By committing to project details pre-EIS, the Port denied itself information the EIS would have provided in shaping the project and informing its decision to sign the lease. For example, the EIS would have provided the Port with a reliable assessment of the spill, accident, and derailment risks associated with the Tesoro project, which would be the largest oil-by-rail terminal in the nation. In light of the project's proximity to downtown Vancouver, Washington,[9] the EIS might have suggested measures to mitigate these risks, or explored reasonable alternatives such as different locations or a reduction in project scale. The Port could have incorporated EIS recommendations into its negotiation platform, or used the EIS's environmental risk analysis to determine whether specific provisions in the lease—such as Tesoro's $25 million pollution insurance cap—were adequate. Instead, the Port decided to sign the lease and commit itself to the Tesoro project without being fully informed of the likely environmental consequences. SEPA requires more.

Perplexingly, the majority acknowledges that the Port's decision "whether to lease public property under its control . . . is independently subject to SEPA and must await the lead agency's analysis of environmental impacts." Majority at 20-

---

[9] CP at 216-18 (minutes from public meeting indicating safety concerns of Vancouver-area residents).

21. We agree, and cannot understand how the majority nevertheless concludes that the Port complied with SEPA when it signed a binding lease before EFSEC completed its EIS. The Port restricted available alternatives in violation of WAC 197-11-070(1)(b) and in conflict with SEPA's core mandate of environmentally informed decision-making. We should reverse.

## CONCLUSION

After finding that the Port is subject to WAC 197-11-070(1)(b) and not exempt from SEPA, the majority endorses the Port's actions in conflict with both. A binding commercial lease self-evidently limits the parties' alternatives, and standard contract frustration language is an inadequate safeguard for reasonable alternatives under SEPA. Similarly, SEPA requires the EIS to inform both project design and final decisions—yet the Port's actions preceded the EIS's existence. The majority's analysis has the consequence of granting the Port a sweeping exemption from SEPA, allowing the Port and Tesoro to advance the design of the nation's largest ever oil-by-rail project completely without the benefit of environmental review. Because this result runs contrary to the core mandate of SEPA, we respectfully dissent.

_____
Stephens, J.

George McCloud, Jr.

_signature_